Mark L. Block (SBN 115457)
mblock@wargofrench.com
Bryant S. Delgadillo (SBN 208361)
bdelgadillo@wargofrench.com
WARGO & FRENCH LLP
1888 Century Park East, Suite 1520
Los Angeles, CA 90067
Telephone: 310-853-6300
Facsimile: 310-853-6333

Attorneys for Plaintiffs
JPMorgan Chase Bank, N.A. and J.P. Morgan Securities LLC

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA—LOS ANGELES DIVISION

| | |
|---|---|
| IN RE:<br><br>JOSEPH ELLISON,<br><br>Debtor.<br>――――――――――――――――<br>JPMORGAN CHASE BANK, N.A.,<br>JPMORGAN SECURITIES, LLC,<br><br>                         Plaintiffs,<br>          v.<br>JOSEPH ELLISON,<br><br>                         Defendant. | Adv. Case No:  2:15-ap-01001-RK<br>Case No.: 2:14-bk-24463-RK<br><br>Chapter 7<br><br>**PRE-TRIAL STIPULATION FOR CLAIMS FOR RELIEF** |

## <u>PRE-TRIAL STIPULATION</u>

     JPMorgan Chase Bank, N.A. and J.P. Morgan Securities, LLC (collectively, "JPMorgan"), plaintiffs in this adversary proceeding, and Joseph Ellison ("Defendant"), defendant in this adversary proceeding, submit the following PRE-TRIAL STIPULATION through their respective counsels pursuant to Local Bankruptcy Rule 7016-1(b)(2).

## I.    UNDERLYING ISSUES OF FACT COMMON TO ALL CLAIMS FOR RELIEF

Per this Court's August 3, 2015 Order on JPMorgan's Motion for Summary Judgment ("MSJ Order"), the following facts are undisputed and will be treated as established at trial:

1.    Defendant was employed by JPMorgan as a financial advisor until approximately April 2012.  (SUMF, ¶ 1.)

2.    During the course of his employment, Defendant developed an animus towards JPMorgan.  (SUMF, ¶ 2.)

3.    In or about June 2012, Defendant initiated an arbitration action against JPMorgan before a Financial Regulatory Authority panel, FINRA case number 12-02244 ("FINRA Action"), by asserting various claims related to his employment.  (SUMF, ¶ 3.)

4.    JPMorgan filed a counterclaim in the FINRA Action for breach of contract related to a loan, in the approximate amount of $750,000, that Defendant obtained from JPMorgan as part of his employment, but failed to repay.  (SUMF, ¶ 4.)

5.    During the FINRA Action, Defendant was represented by counsel.  His original counsel, Shustak & Partners LLP ("Shustak"), was replaced during the proceeding as the result of a fee dispute.  (SUMF, ¶ 5.)

6.    Defendant's replacement counsel, Jeffrey Sigler, represented Defendant on a contingency basis.  (SUMF, ¶ 6.)

7.    The FINRA panel conducted an evidentiary hearing from April 28, 2014 to May 6, 2014.  (SUMF, ¶ 7.)

8.    On or about June 3, 2014, the FINRA panel found against Defendant on his claims and in favor of JPMorgan on its counterclaim, entering an award in favor of JPMorgan in the amount of $789,624.06 ("FINRA Award").  (SUMF, ¶ 8.)

9.    On July 17, 2014, JPMorgan initiated a proceeding with the United States District Court for the Central District of California, case number CV14-05567,

for judicial confirmation of the FINRA Award ("FINRA Award Confirmation Action").  (SUMF, ¶ 9.)

10.   Less than two weeks later, on July 29, 2014, Defendant filed a voluntary petition for relief under chapter 7 of Title 11 of the United States Code ("Petition Date"), thereby initiating bankruptcy case number 2:14-bk-24463-RK, in the U.S. Bankruptcy Court for the Central District of California, Los Angeles Division ("Bankruptcy Case").  (SUMF, ¶ 10.)

11.   The FINRA Award Confirmation Action was stayed as a result of Defendant filing the Bankruptcy Case.  *See* 11 U.S.C. § 362(a).  (SUMF, ¶ 10.)

12.   In the Schedule F filed concurrently with the petition in the Bankruptcy Case, Defendant reported unsecured debts totaling $926,506.00, including:  (1) $789,000 owed to JPMorgan on account of the FINRA Award (not listed as disputed, contingent, or unliquidated); and (2) $45,000 owed to Shustak related to the attorney fee dispute (listed as disputed).  (SUMF, ¶ 11.)

13.   JPMorgan and Shustak are Defendant's two largest unsecured creditors and the debts owed to them account for approximately 90 percent of all of the Defendant's unsecured debt.  (SUMF, ¶ 12.)

14.   Eleven Sixteen LLLP is a limited liability company was created in January 2014.  (SUMF, ¶ 14.)

15.   Defendant admits that he retained a firm to form a trust and limited liability partnership, but denies that he formed or created Eleven Sixteen LLLP. (SUMF, ¶ 15.)

16.   Defendant and his wife, Ellen Ellison, are the owners of the residential real property located at 555 S. Norton Avenue, Los Angeles, California 90020 ("Property").  (SUMF, ¶ 16.)

17.   In addition to the Property, Defendant holds interests in various bank accounts including:   (1) Joseph Ellison ITF Ellen Ellison, City National Bank, account ending 1756 ("Defendant's CNB Account"); and (2) Joseph Ellison and Ellen

1  Ellison Joint WROS, Mutual Securities, Inc., account ending 9350 ("Joint Account").

2  (SUMF, ¶ 17.)

3      18.    While the FINRA Action was pending, on or about February 14, 2014,

4  Defendant and his wife obtained a loan, in the principal amount of $1,496,500 from

5  Greenbox Loans, Inc. ("First DOT").  Dovenmuehle Mortgage, Inc. is the current

6  servicer of the First DOT.  (SUMF, ¶ 19.)

7      19.    The funds from the First DOT were disbursed as follows: (1) payoff of a

8  deed of trust in favor of Ocwen Loan Servicing in the approximate amount of

9  $605,728.11; (2) payoff of deed of trust in favor of Morgan Stanley Home Loans in

10  the approximate amount of $742,802.77; and (3) disbursement in the approximate

11  amount of $69,441.17 to Defendant's CNB Account.  (SUMF, ¶ 20.)

12      20.    Additionally, while the FINRA Action was pending, on or about

13  February 28, 2014, Defendant and his wife obtained a loan, in the principal amount of

14  $200,000 from Brian Dror and Rafael Ryzman ("Second DOT").  Logan Investments

15  is the current servicer of the Second DOT.  SUMF, ¶ 21.)

16      21.    The funds from the Second DOT, in the approximate amount of

17  $178,509.68, were disbursed to Defendant's CNB Account.  (SUMF, ¶ 22.)

18      22.    The First DOT and Second DOT fully encumbered the Property.

19  (SUMF, ¶ 23 (reflecting value of the property of $1,500,000 and encumbered with

20  debts totaling $1,716,551.00).)

21      23.    On or about March 1, 2014, the funds disbursed to Defendant from the

22  First DOT and the Second DOT, totaling $247,950.85, were in Defendant's CNB

23  account.  (*See* SUMF, ¶¶ 20, 22.)

24      24.    Later that same month, Defendant transferred a total of $38,000 to two of

25  his friends, Ed Jeffers and Charles Springer.  (SUMF, ¶ 24.)  Defendant testified that

26  he was repaying one personal and one business project loan to these individuals,

27  although the purported business loan was to pay for Defendant's living expenses.

28  (*Id.*)

25.    While the FINRA Action was pending and shortly after the evidentiary hearing in the matter concluded, on or about May 12, 2014, Defendant transferred $18,000 from Defendant's CNB Account to an account held by the Law Offices of Ellen Ellison, at City National Bank, account ending 5499 ("Wife's CNB Account"). (SUMF, ¶ 25.)

26.    Approximately one week after the issuance of the FINRA Award, on or about June 10 and June 11, 2014, Defendant transferred, through two transactions, a total of $51,000 from Defendant's CNB Account to his Wife's CNB account. (SUMF, ¶ 27.)

27.    Less than two weeks after the entry of the FINRA Award, on or about June 16, 2014, Defendant transferred $121,000 from Defendant's CNB Account to the corporate account of Clownputsch, Inc., a corporation wholly owned by Defendant, at City National Bank account ending 7881 ("Clownputsch Account"). (SUMF, ¶ 28.)

28.    Defendant testified during the 2004 examination that he transferred the funds, in part, because he was afraid people were going to take all his money away and leave his family destitute.  (SUMF, ¶¶ 29, 30.)

29.    Defendant retained bankruptcy counsel on or about June 15, 2014 (SUMF, ¶ 31.)

30.    On or about June 21, 2014, Defendant transferred $119,000 from Clownputsch Account to Defendant's CNB Account.  (SUMF, ¶ 32.)

31.    On or about July 9, 2014, six days after receiving notice of the FINRA Award against him and three weeks before filing his petition, Defendant transferred $41,415.30 from Defendant's CNB Account to Dovenmuehle Mortgage, thereby prepaying the First DOT for six months.  (SUMF, ¶ 33.)

32.    Also on or about July 9, 2014, Defendant transferred $11,062 from Defendant's CNB Account to Logan Investments, thereby prepaying the Second DOT for six months.  (SUMF, ¶ 34.)

33.    Defendant testified at his 2004 Examination as follows:

A. Well, at the time that the payments were made – let's see. . . .  July was the prepayment[,] by then the case had been decided, and I didn't know what I was going to do.  Really, we were trying to make up our mind what we were going to do, and then I just wanted to make sure that those -- that whatever happened -- I mean, I got a threatening letter.  **I got threatening letters from the beginnings of what might have been attempts to collect money or whatever, and I just wanted to make sure that we wouldn't be thrown out in the street**.

Q.   And who did those letters come from?

A.  Well, I got -- well, the award in and of itself was pretty breathtaking.  When I got the notice of the award, that was F.I.N.R.A., and the F.I.N.R.A. fees.  I didn't know if I would lose my license.  I didn't.  J.P. Morgan, obviously, they had sent me by July -- yeah.  They had sent me a letter by then saying they wanted their money.   And who else was there?  I was having fee disputes.  That's another thing.  I was having a fee dispute.  I found out that I was grossly overcharged by the attorneys I used first, and I got several attorneys' opinions, and so I was possibly fighting with them.  **Whatever else was going to go on, I wanted to make sure my family was at least ensconced in our home until the end of the year.**

[. . .]

**Its a priority of survival.  I wanted to make sure we had a home to live in and a place to live in while all this was going on**.

Q.    So if you had kept the funds in your city national bank account, why wouldn't they have been there for you to be able to pay your mortgage?

**A. Well, I didn't know if, for example, Shustak had gotten a judgment,** which he didn't.  They threw him out of court, but he kept trying to do things.  I didn't know where -- I felt under siege.  I guess you can understand that.  **So I had to prioritize where this money went, and other than food and other -- certain other things that had to be accounted -- you know, taken care of.  This was a pretty important piece of that puzzle.**

Q. Okay.  So were [you] concerned that Shustak might get the judgment and then take the money?

---

A. That was a possibility.  I thought I had -- I mean, I had a few disputes.  I reported . . . .

Q.  Were you concerned that the money would have gone to J.P. Morgan?

A. I don't remember my thinking about that.  But I remember thinking, "if I don't keep a roof over our heads right now, we're going to be in a lot of trouble."

(SUMF, ¶ 36.)

34.    Defendant further testified that he "had to prioritize where this money went" and that repayment of the First DOT and Second DOT "was a pretty important piece of that puzzle." (SUMF, ¶ 37.)

35.    The funds transferred to Dovenmuehle Mortgage and Logan Investments, totaling $52,477.30 are not available for distribution to Defendant's unsecured creditors.  (SUMF, ¶ 38.)

36.    Defendant transferred, through four separate transactions, a total of $31,600 from the non-exempt Joint Account to various destinations.  (SUMF, ¶¶ 39, 40.)  This included a transfer of $17,000.00 to his wife on the Petition Date.  (SUMF, ¶ 40.)

37.    The four transactions posted to the Joint Account after the Petition Date. (SUMF, ¶ 41.)

38.    As a result of the four transfers, the balance of the Joint Account decreased from $33,494.92 to $1,895.02.  (SUMF, ¶ 42.)

39.    Defendant disclosed a balance for the Joint Account of $1,895.02 in the Schedule B.  (SUMF, ¶ 43.)

Per the Court's MSJ Order, the following facts will be contested at trial:

1.    Defendant's bankruptcy schedules and statement of financial affairs did not disclose any interest in a limited liability limited partnership, or a bank account in the name of a company owned by the Defendant, Clownputsch, Inc.

**JPMorgan's Evidence**:

Testimony of Defendant

Exhibit: The Voluntary Petition for Relief Schedules filed on July 29, 2014.

**Defendant's Evidence**:

Exhibit:  The voluntary petition for relief, including schedules, filed on July 29, 2014.

2.    Defendant held no interest in his Wife's CNB Account.

**JPMorgan's Evidence**:

Testimony of Defendant

**Defendant's Evidence**:

The voluntary petition for relief, including schedules, filed on July 29, 2014.

3.    Defendant prepaid the First DOT and Second DOT because he had received a collection letter related to the FINRA Award and had a fee dispute pending with Shustak, and wanted to ensure that his family could remain in the Property and that the funds used for the prepayment would not go to pay any judgment obtained by Shustak.

**JPMorgan's Evidence**:

Testimony of Defendant

Exhibit: Defendant's Answer to Complaint Objection to Discharged, filed on February 3, 2015.

**Defendant's Evidence:**

Testimony of Defendant as to his intent with respect to prepaying mortgage payments from September through December, 2014.

## II.   CLAIMS FOR RELIEF

**A.   First Claim:  For a determination that Defendant's Debts are Not Dischargeable pursuant to 11 U.S.C. § 727(a)(2)(A).**

**1.   ELEMENTS OF THE CLAIM**

a.   Defendant transferred property within one year prior to the petition date

**Not contested per Court's MSJ Order**

b.   with the intent to hinder, delay, or defraud at least one of his creditors.

**Contested**

**JPMorgan**:  Defendant made the transfers with the intent to hinder, delay, or defraud at least one of his creditors.  "When a debtor admits that he acted with the intent penalized by section 727(a)(2)(A), there is no need for the court to rely on circumstantial evidence or inferences in determining whether the debtor had the requisite intent." *In re Adeeb*, 787 F.2d 1339, 1343 (9th Cir. 1986) ("Adeeb admitted that he transferred the property intending to put it out of the reach of one of his creditors.").  Additionally, entry of a discharge order should be denied if a debtor "had the intent penalized by the statute notwithstanding any other motivation he may have had for the transfer." *Id.* at 1343; *accord Beverly v, Beverly*, 374 B.R. 221, 246 (B.A.P. 9th Cir. 2007); *cf. Matter of Trinity Baptist Church*, 25 B.R. 529, 532–33 (Bankr. M.D. Fla. 1982) ("Intent to defraud within the meaning of the statute is the debtor's intention to prevent his creditors from satisfying their debts. . . . . An evil motive is not required in order to set aside a transfer.")  Here, Defendant repeatedly

admitted under oath that he transferred his property in order to prevent his creditors from gaining access to the property.

**Evidence**: Defendant repeatedly admitted under oath that he transferred his property in order to prevent his creditors from gaining access to the property. Specifically, when asked why he prepaid the First DOT and Second DOT, Defendant testified:

> A.   Well, at the time that the payments were made – let's see. . . . July was the prepayment[,] by then the case had been decided, and I didn't know what I was going to do.  Really, we were trying to make up our mind what we were going to do, and then I just wanted to make sure that those -- that whatever happened -- I mean, I got a threatening letter. **I got threatening letters from the beginnings of what might have been attempts to collect money** or whatever, **and I just wanted to make sure that we wouldn't be thrown out in the street**.

> Q.   And who did those letters come from?

> A.   Well, I got -- well, the award in and of itself was pretty breathtaking.   When I got the notice of the award, that was F.I.N.R.A., and the F.I.N.R.A. fees.  I didn't know if I would lose my license.  I didn't.  J.P. Morgan, obviously, they had sent me by July -- yeah.  They had sent me a letter by then saying they wanted their money.  And who else was there?  I was having fee disputes.  That's another thing.  I was having a fee dispute.  I found out that I was grossly overcharged by the attorneys I used first, and I got several attorneys' opinions, and so I was possibly fighting with them. **Whatever else was going to go on, I wanted to make sure my family was at least ensconced in our home until the end of the year.**

> [. . .]

> A.   **Its a priority of survival.  I wanted to make sure we had a home to live in and a place to live in while all this was going on**.

> Q.   So if you had kept the funds in your city national bank account, why wouldn't they have been there for you to be able to pay your

mortgage?

A.    **Well, I didn't know if, for example, Shustak had gotten a judgment,** which he didn't.  They threw him out of court, but he kept trying to do things.  I didn't know where -- I felt under siege.  I guess you can understand that.  **So I had to prioritize where this money went, and other than food and other -- certain other things that had to be accounted -- you know, taken care of.  This was a pretty important piece of that puzzle.**

Q.    Okay.  So were [you] concerned that Shustak might get the judgment and then take the money?
A.    That was a possibility.  I thought I had -- I mean, I had a few disputes.  I reported . . . .

Q.    Were you concerned that the money would have gone to J.P. Morgan?

A.    I don't remember my thinking about that.  But I remember thinking, "if I don't keep a roof over our heads right now, we're going to be in a lot of trouble."

(emphases added).

Further, when subsequently questioned about the movement of $121,000 to the Clownputsch Account after the entry of the FINRA Award, Defendant testified:

A.  Well, the amount was -- it wasn't the amount.  It was the fact that I was moving a lot of money into other accounts to save money on fees, and also, I really can't explain it.  It was a panicky kind of thing to do.  **Look, I was afraid people were going to come and take all my money away, and leave us destitute.**

(emphasis added)

Defendant's admissions are further supported by the sequence of events preceding the filing of his bankruptcy petition.  For the purposes of section 727(a)(2)(A), intent to hinder, delay, or defraud may be established by circumstantial evidence or by inferences drawn from a course of conduct.  *See Beverly*, 374 B.R. at

243; *In re Adeeb*, 787 F.2d at 1343 (citing *In re Devers*, 759 F.2d 751, 755 (9th Cir. 1985)).

Here, Defendant removed equity from the Property and used the proceeds to pay his wife, his friends, and certain creditors so that his family could continue to retain the benefits of the funds and live in the Property.  Indeed, as a result of Defendant overencumbering the Property, the Property will not be administered through Defendant's bankruptcy case.  Likewise, as a result of the transfers, the disbursed funds (which would have otherwise remained in Defendant's [unencumbered] CNB Account) are not available for distribution to Defendant's unsecured creditors.  Creditors are thus unlikely to recover much, if anything, from Defendant's bankruptcy estate, while Defendant continues to benefit from the diversion of assets otherwise intended for distribution to his creditors.

Furthermore, the timing, quantity, and circumstances surrounding these transfers—which occurred while the FINRA Action was pending, while an evidentiary hearing was on going, while the issuance of an adverse FINRA award was imminent, and shortly after the issuance of the FINRA award—highlight that Defendant made the transfers to hinder creditors' ability to recover from his assets.

For example, within the five months preceding the Petition Date and while the FINRA Action was pending, Defendant sought the assistance of an asset protection law firm to create an asset protection trust and establish an LLLP and then drained the Property of nearly $250,000 in equity and his bank accounts of over $190,000 dollars. Defendant also used the funds for his personal benefit, and to repay certain creditors, including his friends.

Six days after the conclusion of a week-long evidentiary hearing in the FINRA Action, Defendant transferred $18,000 to his Wife's CNB Account.  One week after the FINRA Award issued, Defendant, through two transactions, transferred an additional $51,000 to his Wife's CNB Account.  Then, five days later, Defendant transferred $121,000 Defendant's CNB Account to Clownputsch, Inc.  He admitted

1  doing so because he was worried about what would happen, he wanted to retain the

2  funds to benefit himself and his family, and he did not want anyone to gain access to

3  these funds.

4      Defendant had not returned all of the funds transferred to Clownputsch, Inc. or

5  his Wife's CNB Account by the Petition Date, and did not disclose the remaining

6  account balance in the Clownputsch, Inc. account in his schedules. The series and

7  context of these transfers thus demonstrate a basis to deny entry of a discharge order

8  in this case.

9      Moreover, Defendant's animus towards JPMorgan and his former counsel,

10  Shustak, underscores the fact that the transfers were made to hinder, delay, or defraud

11  creditors.  Defendant has been open about his hostility towards both creditors, who

12  are the largest unsecured creditors in his bankruptcy case.

13      The transfer of Defendant's property prevented the distribution of said property

14  to Defendant's unsecured creditors.  Indeed, if Defendant had not transferred the

15  funds, the funds would be in Defendant's CNB Account and available for distribution

16  as part of the bankruptcy estate.  For instance, if Defendant had not made the transfers

17  to Dovenmuehle Mortgage and Logan Investments, then $52,477.30 would have been

18  in Defendant's CNB Account on the Petition Date; the $52,477.30 would have

19  become part of the bankruptcy estate by operation of the law; and the $52,477.30

20  would have been available for distribution to Defendant's unsecured creditors.  The

21  same is true for all of the other transfers Defendant made.  Indeed, Defendant

22  recognized that, absent the transfers, the funds would be available to benefit his

23  creditors, including Shustak and J.P. Morgan.  In order to avoid that outcome, he

24  made the various transfers at issue to his wife and preferred creditors in the weeks

25  preceding the Petition Date to ensure the funds were distributed as he—and not as the

26  Bankruptcy Code—deemed appropriate.

27      Thus, as the totality of the circumstances demonstrate multiple indicia of fraud,

28  the Court should find that Defendant transferred property pre-petition with the intent

1   to hinder, delay, or defraud creditors and deny the entry of a discharge order in his

2   bankruptcy case under section 727(a)(2)(A).

3

4   **Defendant**:

5   **Evidence**:

6   Defendant's testimony.  His testimony, partially described above, indicated that

7   he wanted to make sure that he had a home for his family at least through the end of

8   2014.  He testified at his 2004 Examination that "I wanted to make sure that I had a

9   home to live in while this whole issue dragged out, and we sorted everything out.  I

10  didn't want to be default on these loans".  Ellison 2004 Exam, Exhibit 6 to

11  Goebelsmann declaration at page 191.  Further, at the time that the residence was

12  refinanced, there had been no resolution of the JP Morgan arbitration and in fact,

13  Ellison was quite confident that he would prevail in that litigation.

14  Ellison will testify that there was likely no equity in the Norton residence

15  before the refinance, and that he certainly could live off the proceeds and not dedicate

16  those refinance proceeds to specific creditors.  He will also testify that he had, for

17  several years, been mostly living off of IRA withdrawals, and the refinance proceeds

18  gave him some breathing room and would extend the life of the remaining IRA funds.

19  He used funds to repay some personal loans, pay tax obligations and personal living

20  expenses, and property disclosed all amounts in bank accounts on the date of filing, in

21  fact turning over non-exempt funds to the trustee.

22  Constructive fraudulent intent cannot be the basis for denial of discharge.  First

23  Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1343 (9th Cir., 1986).

24  Fraudulent intent may be established by circumstantial evidence or by inference

25  drawn from a course of conduct, and debtor's testimony is replete that of paramount

26  importance to him was having a roof over his head for himself and his family.

27  This case is not the traditional case wherein the debtor has transferred real

28  estate or other valuable assets out of his name in order to avoid creditors.  Here, the

complaining creditor is alleging that the debtor's refinance of his property and subsequent use of the refinance proceeds over the next 5 months left them unable to collect their debt.  That is not grounds for denial of discharge.

**B.     Second Claim:  For a determination that Defendant's Debts are Not Dischargeable pursuant to 11 U.S.C. § 727(a)(2)(B).**

**1.     ELEMENTS OF THE CLAIM**

a.     Defendant transferred property of the estate after the petition date

**Not contested per Court's MSJ Order**

b.     with the intent to hinder, delay, or defraud at least one of his creditors.

**Contested**

**JPMorgan**:  Defendant transferred the amount of $31,600 from the Joint Account with the intent to hinder, delay, or defraud creditors.

Evidence:  Defendant's pattern of activity, and the continuance of that activity after the Petition Date, indicates that Defendant made the postpetition transfers with the intent to hinder, delay, or defraud his creditors.

In the months preceding the Petition Date, Defendant repeatedly transferred funds to place various assets out of the reach of his creditors—including, fully encumbering his residence, removing funds from his personal account to a business account, and transferring funds to his wife and preferred creditors who were personal associates.

The four postpetition transfers are a continuance of this impermissible activity. Indeed, Defendant executed the checks to initiate the transfers on the Petition Date, and the funds were diverted from the bankruptcy estate—including the payment of $17,000 to Defendant's Wife.  Defendant's schedules do not accurately report the balance of the Joint Account as of the Petition Date, even though the funds became part of the bankruptcy estate when the petition was filed and should have been disclosed in accordance the Bankruptcy Code and the Federal Rules of Bankruptcy

Procedure.  Because Defendant removed these funds from the Joint Account, the proceeds are not available for distribution to unsecured creditors.  Instead, Defendant continues to benefit from assets that would have otherwise been used to compensate his creditors.  Accordingly, based upon these improper transfers, Defendant should be denied a discharge pursuant to section 727(a)(2)(B).

**Defendant**:

**Evidence**:

Testimony of Debtor.  He moved money around from one account to another on the eve of bankruptcy and disclosed the amounts as if the funds had cleared. Apparently, however, they had not yet cleared.  If there were funds in the account that were not exempt, it is an issue for the bankruptcy trustee to administer those funds.

## III.    AFFIRMATIVE DEFENSES

Defendant, at no time, transferred assets with the intent to hinder, delay or defraud creditors.

## IV.    EXHIBITS TO BE OFFERED BY EACH PARTY AND OBJECTIONS TO EXHIBITS

A.      JPMorgan's Exhibits are attached to this order as Appendix 1. Defendant stipulates to the admissibility and authenticity of the exhibits listed in Appendix 1.

B.      Defendant's Exhibits are attached to this order as Appendix 2. JPMorgan stipulates to the admissibility and authenticity of the exhibits listed in Appendix 2.  Defendant offers no independent exhibits other than those that were attached to Plaintiff's Summary Judgment Motion.

If there is a dispute as to the authenticity or admissibility of either party's exhibits, the objecting party shall file and serve concurrently with this pre-trial stipulation any motion to exclude evidence with supporting memorandum of points and authorities.  Any response to the motion shall be filed and served two court days prior to the pre-trial conference. All objections to the admission of exhibits shall be

resolved at the pre-trial conference.  The failure to so object to the admission of exhibits listed in Appendices 1 and 2 may be deemed a waiver of any objection.

## V.   WITNESSES TO BE OFFERED BY EACH PARTY

### A.   **JPMorgan**:

A list of the only witnesses JPMorgan shall call to testify at trial, a summary of their intended testimony, and an estimate of the length of direct and cross-examination is attached to this order as Appendix 3.

### B.   **Defendant**:

A list of the only witnesses Defendant shall call to testify at trial, a summary of their intended testimony, and an estimate of the length of direct and cross-examination is attached to this order as Appendix 4.

## VI.   REBUTTAL TESTIMONY

JPMorgan, who has the burden of establishing each element of its claim(s) for relief, will be the first to introduce evidence to prove the facts necessary to enable Plaintiff to recover.  When JPMorgan rests, Defendant may then present evidence to contravene any of Plaintiff's claims or in support of any affirmative defenses which Defendant has included in this pre-trial stipulation.  After the close of Defendant's case, JPMorgan may present rebuttal testimony only to counter evidence previously submitted by Defendant on issues not raised in JPMorgan's original presentation of its case.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## STIPULATION

The foregoing admissions have been made by the parties, and the parties have specified the foregoing issues of fact and law remaining to be litigated.  Therefore, this stipulation shall supersede the pleadings and govern the course of trial in this adversary proceeding, unless modified to prevent manifest injustice.

IT IS SO STIPULATED.

Dated: August 18, 2015                    WARGO & FRENCH LLP

                                          By: */s/ Bryant S. Delgadillo*_____
                                               Bryant S. Delgadillo

                                          Attorney for Plaintiffs JPMorgan Chase Bank,
                                          N.A. and J.P. Morgan Securities LLC

Dated: August 18, 2015                    By:  /s/ David S. Hagen
                                               David Hagen, Esq

                                          Attorney for Defendant
                                          Joseph Ellison

APPENDIX 1

| JPMorgan's Trial Exhibit List | |
|---|---|
| **Exhibit Number** | **Description** |
| 1 | Defendant's Responses to Interrogatories, Set one, dated May 5, 2015 |
| 2 | Defendant's Responses to Request for Admission, Set One, dated May 5, 2015 |
| 3 | Defendant's Responses to Requests for Production of Documents, Set One, dated April 22, 2015 |
| 4 | Defendant's Responses to Interrogatories, Set Two, dated May 14, 2015 |
| 5 | Defendant's Responses to Requests for Admission, Set Two, dated May 7, 2015 |
| 6 | Answer to Complaint Objection to Discharge filed on February 3, 2015 |
| 7 | Petition to Confirm FINRA Arbitration Award from Financial Regulatory Authority filed on July 17, 2014 |
| 8 | The Voluntary Petition for Relief and Schedules filed on July 29, 2014 |
| 9 | The Proof of Claim No. 2 filed by Wood, Erickson & Whitaker LLP on April 27, 2015 |
| 10 | A proof of registration for Eleven Sixteen LLP from the Nevada Secretary of State website as of April 28, 2015 |

APPENDIX 2

Defendant's Trial Exhibits

    A.  HUD Closing Statement for refinance of First Trust Deed
    B.  HUD Closing Statement for refinance of Second Trust Deed
    C. CNB bank statement for account ending in 1756 for period from January 31, 2014 through February 28, 2014
    D.  CNB bank statement for account ending in 1756 for period from February 28, 2014 through March 31, 2014;
    E.  CNB bank statement for account ending in 1756 for period of March 31, 2014 through April 30, 2014;
    F. CNB bank statement for Clownputsch, Inc. ending in 7881 for period of May 30, 2014 through June 30, 2014;
    G. CNB bank statement for account ending in 1756 for period of June 30, 2014 through July 31, 2014
    H. Mutual Securities Account statement for account ending in 9350 for period from July 1, 2014 through July 31, 2014.

APPENDIX 3

JPMorgan's Witnesses:

1.      Defendant Joseph Ellison

        Mr. Ellison will be examined on the following:

        A.      An explanation and/or justification for all pre-petition transfers.

        B.      An explanation and/or justification for all post-petition transfers.

        C.      An explanation of his bankruptcy schedules

        D.      Defendant's interest in his wife's accounts

        E.      Defendant's decision to refinance the loan on his residence.

        F.      Defendant's decision to take out a line of credit on his house.

        G.      Defendant's decision to pre-pay his mortgages.

        I.      Defendant's decision to retain asset protection specialists.

Estimated Direct Examination of 3 hours.

2.      Ellen Ellison

        Mrs. Ellison will be examined on the following:

        A.      Defendant's interest in Mrs. Ellison's accounts

        B.      The Ellison's decision to refinance the loan on their residence.

        C.      The Ellison's decision to take out a line of credit on their house.

        D.      The Ellison's decision to pre-pay their mortgages.

        E.      The Ellison's decision to retain asset protection specialists.

Estimated Direct Examination of 1.5 hours.

APPENDIX 4

Defendant's Witnesses:

Defendant Joseph Ellison

      Mr. Ellison will be examined on the following:

    A.      An explanation and/or justification for all pre-petition transfers.

    B.      An explanation and/or justification for all post-petition transfers.

    C.      An explanation of his bankruptcy schedules

    D.      Defendant's interest in his wife's accounts

    E.      Defendant's decision to refinance the loan on his residence.

    F.      Defendant's decision to take out a line of credit on his house.

    G.      Defendant's decision to pre-pay his mortgages.

    I.      Defendant's decision to retain asset protection specialists.

Estimated Direct Examination of 2 hours.

2.    Ellen Ellison

      Mrs. Ellison will be examined on the following:

    A.      Defendant's interest in Mrs. Ellison's accounts

    B.      The Ellison's decision to refinance the loan on their residence.

    C.      The Ellison's decision to take out a line of credit on their house.

    D.      The Ellison's decision to pre-pay their mortgages.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
1888 Century Park East, Suite 1520, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled (*specify*): **PRE-TRIAL STIPULATION FOR CLAIMS FOR RELIEF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 8/18/2015, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

EMAIL: Defendants' Counsel: David Hagen, Esq. go4brog@earthlink.net
EMAIL: Trustee: Brad D Krasnoff jmcdaniel@dgdk.com
EMAIL: United States Trustee(LA): ustpregion16.la.efc@usdoj.gov
EMAIL: Interested Party: mdonohoe@welchdonohoe.com

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On 8/18/2015 I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

MAIL: Joseph Ellison BHWM 9454 Wilshire Blvd., Ste 710 Beverly Hills, CA 90212
MAIL: Menchaca & Co. LLP (Accountant): 835 Wilshire Bl Ste 300 Los Angeles, CA 90017

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) 8/18/2015, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

PERSONAL DELIVERY: Chambers: Hon. Robert N. Kwan 255 E Temple St, Ste 1682 Crtrm 1675, Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 8/18/2015 | Elizabeth Castaneda | */s/ Elizabeth Casfaneda* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.