1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



FILED & ENTERED

SEP 23 2016

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY tatum        DEPUTY CLERK

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

In re:

JOSEPH ELLISON,

             Debtor.

_____

JP MORGAN CHASE BANK, N.A., JP
MORGAN SECURITIES, LLC,

             Plaintiffs,

  vs.

JOSEPH ELLISON,

             Defendant.

_____

Case No. 2:14-bk-24463-RK

Chapter 7

Adv. No. 2:15-ap-01001-RK

MEMORANDUM DECISION ON
PLAINTIFFS' ADVERSARY COMPLAINT
OBJECTING TO ENTRY OF DISCHARGE
PURSUANT TO 11 U.S.C. §§ 727(a)(2)(A)
AND (a)(2)(B)

     The above-captioned adversary proceeding on the complaint of plaintiffs JP

Morgan Chase Bank, N.A. and JP Morgan Securities, LLC ("Plaintiffs" or collectively,

"JPMorgan"), asserting claims objecting to discharge of defendant Joseph Ellison

("Defendant"), Debtor, under 11 U.S.C. §§ 727(a)(2)(A) and (a)(2)(B) came on for trial

before the undersigned United States Bankruptcy Judge on November 19, 2015.  Bryant

S. Delgadillo, of the law firm of Wargo & French LLP, appeared for Plaintiffs.  David S.

Hagen, of the Law Offices of David S. Hagen, appeared for Defendant.

1    After trial, on January 15, 2016, Plaintiffs lodged their Proposed Findings of Fact

2  and Conclusions of Law, and on February 1, 2016, Defendant lodged his Proposed

3  Findings of Fact and Conclusions of Law.  ECF 26 and 27.   On February 4, 2016,

4  Defendant filed objections to Plaintiffs' Proposed Findings of Fact and Conclusions of

5  Law.  ECF 28.  Afterwards, the court then took the matter under submission.

6    Having considered the witness testimony and exhibits received at trial, and the

7  other matters in evidence, the court hereby makes the following findings of fact and

8  conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure

9  and Rule 52 of the Federal Rules of Civil Procedure.[1]

10    **FINDINGS OF FACT**

11    Findings of Fact 1 through 39 are undisputed facts that were established through

12  the Pre-Trial Stipulation for Claims for Relief, ECF 22, which the parties jointly filed and

13  was approved by the court in its Order Approving Joint Pretrial Stipulation and Setting

14  Trial Date, ECF 24.

15    1. Defendant was employed by JPMorgan as a financial advisor until

16  approximately April 2012.

17    2. During the course of his employment, Defendant developed an animus towards

18  JPMorgan.

19    3. In or about June 2012, Defendant initiated an arbitration action against

20  JPMorgan before a Financial Regulatory Authority panel, FINRA case number 12-02244

21  ("FINRA Action"), by asserting various claims related to his employment.

22    4. JPMorgan filed a counterclaim in the FINRA Action for breach of contract

23  related to a loan, in the approximate amount of $750,000, that Defendant obtained from

24  JPMorgan as part of his employment, but failed to repay.

25

26
―――――――――――――――――

27  [1] Any findings of fact that should be properly characterized as conclusions of law will be
considered as such, and any conclusions of law that should be properly characterized as findings
of fact will be considered as such.

28

5. During the FINRA Action, Defendant was represented by counsel. His original counsel, Shustak & Partners LLP ("Shustak"), was replaced during the proceeding as the result of a fee dispute.

6. Defendant's replacement counsel, Jeffrey Sigler, represented Defendant on a contingency basis.

7. The FINRA panel conducted an evidentiary hearing from April 28, 2014 to May 6, 2014.

8. On or about June 3, 2014, the FINRA panel found against Defendant on his claims and in favor of JPMorgan on its counterclaim, entering an award in favor of JPMorgan in the amount of $789,624.06 ("FINRA Award").

9. On July 17, 2014, JPMorgan initiated a proceeding with the United States District Court for the Central District of California, case number CV14-05567, for judicial confirmation of the FINRA Award ("FINRA Award Confirmation Action").

10. Less than two weeks later, on July 29, 2014, Defendant filed a voluntary petition for relief under chapter 7 of Title 11 of the United States Code ("Petition Date"), thereby initiating bankruptcy case number 2:14-bk-24463-RK, in the U.S. Bankruptcy Court for the Central District of California, Los Angeles Division ("Bankruptcy Case").

11. The FINRA Award Confirmation Action was stayed as a result of Defendant filing the Bankruptcy Case. *See* 11 U.S.C. § 362(a).

12. In the Schedule F filed concurrently with the petition in the Bankruptcy Case, Defendant reported unsecured debts totaling $926,506.00, including: (1) $789,000 owed to JPMorgan on account of the FINRA Award (not listed as disputed, contingent, or unliquidated); and (2) $45,000 owed to Shustak related to the attorney fee dispute (listed as disputed).

13. JPMorgan and Shustak are Defendant's two largest unsecured creditors and the debts owed to them account for approximately 90 percent of all of the Defendant's unsecured debt.

14. Eleven Sixteen LLLP is a limited liability company was [sic] created in January 2014. [LLLP refers to limited liability limited partnership. *See* Plaintiff's Exhibit 9, Proof of Claim No. 2, filed by Wood, Erickson & Whittaker on April 27, 2015, referring to billing statement for "Drafting and formation of limited liability limited partnership: Eleven Sixteen LLLP [Flat fee] Amount - $7,500.00".]

15. Defendant admits that he retained a firm to form a trust and limited liability partnership, but denies that he formed or created Eleven Sixteen LLLP.

16. Defendant and his wife, Ellen Ellison, are the owners of the residential real property located at 555 S. Norton Avenue, Los Angeles, California 90020 ("Property").

17. In addition to the Property, Defendant holds interests in various bank accounts including: (1) Joseph Ellison ITF Ellen Ellison, City National Bank, account ending 1756 ("Defendant's CNB Account"); and (2) Joseph Ellison and Ellen Ellison Joint WROS, Mutual Securities, Inc., account ending 9350 ("Joint Account").

18. While the FINRA Action was pending, on or about February 14, 2014, Defendant and his wife obtained a loan, in the principal amount of $1,496,500 from Greenbox Loans, Inc. ("First DOT"). Dovenmuehle Mortgage, Inc. is the current servicer of the First DOT. [The court understands that "DOT" refers to a Deed of Trust securing a loan on Defendant's residence. *See* Plaintiff's Exhibit 8, Voluntary Petition for Relief and Schedules filed on July 29, 2014, referring to Schedule D listing "1st trust deed on residence" held by Dovenmuehle Mortgage Inc.; Defendant's Exhibit A, Closing Statement, referring to loan by Greenbox Loans, Inc., to Joseph Ellison and Ellen Ellison.].

19. The funds from the First DOT were disbursed as follows: (1) payoff of a deed of trust in favor of Ocwen Loan Servicing in the approximate amount of $605,728.11; (2) payoff of deed of trust in favor of Morgan Stanley Home Loans in the approximate amount of $742,802.77; and (3) disbursement in the approximate amount of $69,441.17 to Defendant's CNB Account.

20. Additionally, while the FINRA Action was pending, on or about February 28, 2014, Defendant and his wife obtained a loan, in the principal amount of $200,000 from Brian Dror and Rafael Ryzman ("Second DOT"). Logan Investments is the current servicer of the Second DOT.

21. The funds from the Second DOT, in the approximate amount of $178,509.68, were disbursed to Defendant's CNB Account.

22. The First DOT and Second DOT fully encumbered the Property (reflecting value of the property of $1,500,000 and encumbered with debts totaling $1,716,551.00).

23. On or about March 1, 2014, the funds disbursed to Defendant from the First DOT and the Second DOT, totaling $247,950.85, were in Defendant's CNB account.

24. Later that same month, Defendant transferred a total of $38,000 to two of his friends, Ed Jeffers and Charles Springer. Defendant testified that he was repaying one personal and one business project loan to these individuals, although the purported business loan was to pay for Defendant's living expenses.

25. While the FINRA Action was pending and shortly after the evidentiary hearing in the matter concluded, on or about May 12, 2014, Defendant transferred $18,000 from Defendant's CNB Account to an account held by the Law Offices of Ellen Ellison, at City National Bank, account ending 5499 ("Wife's CNB Account").

26. Approximately one week after the issuance of the FINRA Award, on or about June 10 and June 11, 2014, Defendant transferred, through two transactions, a total of $51,000 from Defendant's CNB Account to his Wife's CNB account.

27. Less than two weeks after the entry of the FINRA Award, on or about June 16, 2014, Defendant transferred $121,000 from Defendant's CNB Account to the corporate account of Clownputsch, Inc., a corporation wholly owned by Defendant, at City National Bank, account ending in 7881 ("Clownputsch Account").

28. Defendant testified during the 2004 examination that he transferred the funds, in part, because he was afraid people were going to take all his money away and leave his family destitute.

29. Defendant retained bankruptcy counsel on or about June 15, 2014.

30. On or about June 21, 2014, Defendant transferred $119,000 from Clownputsch Account to Defendant's CNB Account.

31. On or about July 9, 2014, six days after receiving notice of the FINRA Award against him and three weeks before filing his petition, Defendant transferred $41,415.30 from Defendant's CNB Account to Dovenmuehle Mortgage, thereby prepaying the First DOT for six months[2].

32. Also on or about July 9, 2014, Defendant transferred $11,062 from Defendant's CNB Account to Logan Investments, thereby prepaying the Second DOT for six months.[3]

33. Defendant testified at his 2004 Examination as follows:

> A. Well, at the time that the payments were made – let's see. . . . July was the prepayment[,] by then the case had been decided, and I didn't know what I was going to do. Really, we were trying to make up our mind what we were going to do, and then I just wanted to make sure that those -- that whatever happened -- I mean, I got a threatening letter. I got threatening letters from the beginnings of what might have been attempts to collect money or whatever, and I just wanted to make sure that we wouldn't be thrown out in the street.
>
> Q. And who did those letters come from?
>
> A. Well, I got -- well, the award in and of itself was pretty breathtaking. When I got the notice of the award, that was F.I.N.R.A., and the F.I.N.R.A. fees. I didn't know if I would lose my license. I didn't. J.P. Morgan, obviously, they had sent me by July -- yeah. They had sent me a letter by then saying they wanted their money. And who else was there? I was having a fee disputes. That's another thing. I was having a fee dispute. I found out that I was

---

[2] Although the parties stipulated that Defendant prepaid both the First and Second DOT by six months, as clarified by Defendant's testimony at trial, it appears that the six month figure included the then currently due monthly payment, and thus, the court finds that Defendant prepaid the First and Second DOT by five months, not six months. *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:22-9:23 a.m.

[3] *Supra* note 2.

grossly overcharged by the attorneys I used first, and I got several attorneys' opinions, and so I was possibly fighting with them. Whatever else was going to go on, I wanted to make sure my family was at least ensconced in our home until the end of the year.

[. . .]

Its a priority of survival. I wanted to make sure we had a home to live in and a place to live in while all this was going on.

Q. So if you had kept the funds in your city national bank account, why wouldn't they have been there for you to be able to pay your mortgage?

A. Well, I didn't know if, for example, Shustak had gotten a judgment, which he didn't. They threw him out of court, but he kept trying to do things. I didn't know where -- I felt under siege. I guess you can understand that. So I had to prioritize where this money went, and other than food and other -- certain other things that had to be accounted -- you know, taken care of. This was a pretty important piece of that puzzle.

Q. Okay. So were [you] concerned that Shustak might get the judgment and then take the money?

A. That was a possibility. I thought I had -- I mean, I had a few disputes. I reported . . . .

Q. Were you concerned that the money would have gone to J.P. Morgan?

A. I don't remember my thinking about that. But I remember thinking, "if I don't keep a roof over our heads right now, we're going to be in a lot of trouble."

34. Defendant further testified that he "had to prioritize where this money went" and that repayment of the First DOT and Second DOT "was a pretty important piece of that puzzle."

35. The funds transferred to Dovenmuehle Mortgage and Logan Investments, totaling $52,477.30 are not available for distribution to Defendant's unsecured creditors.

36. Defendant transferred, through four separate transactions, a total of $31,600 from the non-exempt Joint Account to various destinations. This included a transfer of $17,000.00 to his wife on the Petition Date.

37. The four transactions posted to the Joint Account after the Petition Date.

38. As a result of the four transfers, the balance of the Joint Account decreased from $33,494.92 to $1,895.02.

39. Defendant disclosed a balance for the Joint Account of $1,895.02 in the Schedule B.

40. The parties in their Pre-Trial Stipulation for Claims for Relief, ECF 22, designated the following as Disputed Fact 1 for determination at trial:

[Disputed Fact] "1. Defendant's bankruptcy schedules and statement of financial affairs did not disclose any interest in a limited liability limited partnership, or a bank account in the name of a company owned by the Defendant, Clownputsch, Inc."

The court finds that this disputed fact is not supported by a preponderance of the evidence because Defendant's Schedule B-Personal Property, Petition, Exhibit 8 at 16, disclosed the existence of Clownputsch, Inc.

41. The parties in their Pre-Trial Stipulation for Claims for Relief, ECF 22, designated the following as Disputed Fact 2 for determination at trial:

[Disputed Fact] "2. Defendant held no interest in his Wife's CNB Account."

The court finds that this disputed fact is not supported by a preponderance of the evidence. Based on California Family Code § 760 and *In re Marriage of Braud,* 45 Cal.App.4th 797, 822-823 (1996), the court finds that the evidence shows that Defendant had a community property interest in the funds in his Wife's CNB Account. At trial, Defendant testified that he was not involved in opening his Wife's CNB Account, which belonged to his wife's law practice, that he was not a signatory on that account, that he had no control over the account, that he had nothing to do with the account and that he was not a member of his wife's law practice. *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:17-9:18 a.m. Although Defendant's testimony on these points is credible and although Defendant listed the account as his wife's personal checking

account on his bankruptcy schedules, the court gives more weight to other admitted

evidence.  First, the court observes that Defendant listed his Wife's CNB Account as

community property on Defendant's Schedule B, Exhibit 8 at 14, and claimed a

$24,925.00 exemption in that account, whose value on the Petition Date was scheduled

at $25,793.00 pursuant to Defendant's Schedule C, Exhibit 8 at 20.  Further, even if

Defendant's Wife's CNB Account was his wife's separate property, because community

property was commingled with separate property in Wife's CNB Account, and because no

evidence was presented tracing the source of any separate funds, the court determines

that based upon the admitted evidence, Defendant has a community property interest in

the funds in his Wife's CNB Account.  That is, given that less than three months before

the Petition Date, shortly after Defendant refinanced the Property, Defendant transferred

at least $69,000.00 to his Wife's CNB Account from the refinancing of the Property, which

Defendant listed as community property on Defendant's Schedule A, Exhibit 8 at 13, and

given that no evidence was presented tracing the funds in his Wife's CNB Account to a

separate property source and no other evidence was admitted regarding the

characterization of the Property, the court determines that Defendant had a community

interest in his Wife's CNB Account.  *In re Marriage of Braud,* 45 Cal.App.4th at 822-823

(citations omitted) ("[T]he mere commingling of separate property and community

property funds does not alter the status of the respective property interests, provided that

the components of the commingled mass can be adequately traced to their separate

property and community property sources.  But if the separate property and community

property interests have been commingled in such a manner that the respective

contributions cannot be traced and identified, the entire commingled fund will be deemed

community property pursuant to the general community property presumption of section

760.").

42.  The parties in their Pre-Trial Stipulation for Claims for Relief, ECF 22,

designated the following as Disputed Fact 3 for determination at trial:

> [Disputed Fact] 3. Defendant prepaid the First DOT and Second DOT because he had received a collection letter related to the FINRA Award and had a fee dispute pending with Shustak, and wanted to ensure that his family could remain in the Property and that the funds used for the prepayment would not go to pay any judgment obtained by Shustak.

As discussed in detail below, the court finds this disputed fact to be supported by a preponderance of the evidence.

43. There are no liens on Defendant's CNB Account or the Joint Account.

Finding of Fact 43 was established through the Order on Plaintiffs JPMorgan Chase, N.A. and J.P. Morgan Securities, LLC's Motion for Summary Judgment, ECF 19, which treated certain facts as established pursuant to Federal Rule of Civil Procedure 56(g), but was left out of the parties Pre-Trial Stipulation for Claims for Relief, ECF 22. *See* ECF 11, Exhibit 10, Proposed Uncontroverted Fact No. 18.

In addition to the findings of fact set forth above, the court makes the following findings of fact based on the testimony at trial.

44. As indicated by Defendant's testimony that less than one month after the FINRA award, he thought of prepaying the loans secured by DOTs on his residence by five months because "I had the money at that time and I wanted to make sure my family was protected and that I had paid my primary obligation to them for that period of time," *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:22-9:23 a.m., and that a primary motivation behind his home loan prepayments was that he was concerned about his prior lawyer, who he was having a fee dispute with, and who has a disputed claim in Defendant's bankruptcy case, "from coming in and attaching his assets," *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:24-9:25 a.m., such loan prepayments by Defendant indicate an intent on his part to hinder or delay payment of his non-preferred creditors, including Shustak, his prior lawyer, and JPMorgan, the FINRA awardee, in taking his nonexempt home equity to prepay the preferred home loan lenders holding DOTs on the home where he and his family resided.

45.  As indicated by Defendant's testimony that he prepaid Dovenmuehle Mortgage, the servicer for the First DOT on the Property, roughly $40,000.00 (i.e., $41,415.30), and Logan Investments, the servicer for the Second DOT on the Property, roughly $11,000.00 (i.e., $11,062.00), "to assure that my wife and my daughter and myself had a home to live in through the end of the year . . . I did prepay [the home loans in the past] but not to that degree, not six months, or four months, five months, whatever it was in advance, normally." *Trial Testimony of Joseph Ellison*, November 19, 2015 at 10:43 a.m., the number of advance mortgage payments were admittedly out of the ordinary and further indicate an intent to hinder or delay payment of his non-preferred creditors.

46.  As indicated by Defendant's testimony that prior to filing his bankruptcy petition, he met with an asset protection firm, and one of his goals in doing so, was to potentially protect his assets from potential creditors, *Trial Testimony of Joseph Ellison*, November 19, 2015 at 10:58-10:59 a.m., and while he changed his mind about using the asset protection firm, the evidence of his consideration, meeting and paying the asset protection firm supports a finding that Defendant intended to hinder or delay his non-preferred creditors.

47.  From his refinancing of the Property, Defendant took out cash of almost $250,000.00 (i.e., $247,950.85) from the equity in the Property.  *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:15 a.m.; *see also,* Finding of Fact No. 23, *supra.*

48.  As stated on his bankruptcy schedules, as of the Petition Date, Defendant had $600.00 in his CNB Account, for which he did not claim an exemption.  Exhibit 8 at 14 and 20.  Furthermore, as stated on his bankruptcy schedules, as of the Petition Date, Defendant had $1,894.00 in the Joint Account, for which he did not claim an exemption. *Id.*

///

1

**CONCLUSIONS OF LAW**

2

Under 11 U.S.C. § 727,

3

[t]he court shall grant the debtor a discharge, unless . . . the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed[,] (A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition.

4

5

6

7

11 U.S.C. § 727(a)(2).

8

A party seeking denial of discharge under § 727(a)(2) must prove two things: "(1) a

9

disposition of property, such as transfer or concealment, and (2) a subjective intent on

10

the debtor's part to hinder, delay or defraud a creditor through the act [of] disposing of the

11

property." *Hughes v. Lawson (In re Lawson),* 122 F.3d 1237, 1240 (9th Cir. 1997);

12

*accord, In re Retz*, 606 F.3d 1189, 1200 (9th Cir. 2010); *Cooke v. Renshaw (In re*

13

*Cooke),* 2016 WL 4039699, slip op. at *5 (9th Cir. BAP 2016), *appeal pending,* No. 16-

14

60068 (9th Cir., notice of appeal filed on August 5, 2016).  Under 11 U.S.C. § 101(54),

15

"The term 'transfer' means . . . (D) each mode, direct or indirect, absolute or conditional,

16

voluntary or involuntary, of disposing of or parting with— (i) property; or (ii) an interest in

17

property."  "Those objecting to discharge 'bear [ ] the burden of proving by a

18

preponderance of the evidence that [the debtor's] discharge should be denied."  *In re*

19

*Retz*, 606 F.3d at 1196, *quoting, Khalil v. Developers Surety & Indemnity Co. (In re*

20

*Khalil),* 379 B.R. 163, 172 (9th Cir. BAP 2007), *affirmed,* 578 F.3d 1167, 1168 (9th Cir.

21

2009); *see also, Beverly v. Beverly (In re Beverly)*, 374 B.R. 221, 243 (9th Cir. BAP 2007)

22

("The burden of proof on an objection to discharge under § 727(a)(2) is preponderance of

23

the evidence."), *affirmed in part and appeal dismissed in part*, 551 F.3d 1092 (9th Cir.

24

2008), *citing inter alia, Grogan v. Garner*, 498 U.S. 279, 289 (1991).

25

"In keeping with the 'fresh start' purposes behind the Bankruptcy Code, courts

26

should construe § 727 liberally in favor of debtors and strictly against parties objecting to

27

discharge." *In re Retz*, 606 F.3d at 1196, *quoting, Bernard v. Sheaffer (In re Bernard),* 96

28

12

F.3d 1279, 1281 (9th Cir. 1996).   While "[t]his does not alter the burden on the objector,

[it] rather means that 'actual, rather than constructive intent is required' on the part of

debtor." *In re Retz*, 606 F.3d at 1196, *quoting, In re Khalil,* 379 B.R. at 172.

## I.    Prepetition Transfers Under 11 U.S.C. § 727(a)(2)(A)

The court first addresses the relevant prepetition transfers at issue in this case

under 11 U.S.C. § 727(a)(2)(A).  As explained in more detail below, based on evidence of

Defendant's prepetition transfers and of his intent to hinder, delay or defraud creditors

JPMorgan and Shustak, his prior lawyer, the court determines that Defendant's discharge

should be denied pursuant to 11 U.S.C. § 727(a)(2)(A).

Within one year prior to filing his bankruptcy petition, Defendant refinanced the

Property by taking out a loan in the principal amount of $1,496,500.00 secured by the

First DOT in favor of Greenbox Loans, Inc., used the $1,496,500.00 to pay off the

previous first deed of trust to Ocwen Loan Servicing and the previous second deed of

trust to Morgan Stanley Home Loans in the amounts of $605,728.11 and $742,802.77

respectively, deposited the remaining $69,441.17 in Defendant's CNB account, took out

another loan in the amount of $200,000.00 secured by the Second DOT in favor of Brian

Dror and Rafael Ryzman, and then deposited $178,509.68 of the $200,000.00 in

Defendant's CNB account.  Subsequently, from the refinancing proceeds deposited into

Defendant's CNB account, Defendant transferred $38,000.00 to two friends, Ed Jeffers

and Charles Springer, allegedly in satisfaction of two debts owed to them, separately

transferred $18,000.00 and $51,000.00 from Defendant's CNB Account to his Wife's CNB

Account, and transferred $41,415.30 to Dovenmuehle Mortgage and $11,062.00 to

Logan Investments, thereby prepaying the loans secured by the First and Second DOTs

on the Property by five months.  At or just before the petition date, Defendant also

transferred $31,600.00 from Defendant's non-exempt Joint Account to various

destinations, including a $17,000.00 transfer to his wife on the Petition Date.  Because all

of the above-described acts involved the disposition of or parting with of property within

13

1    the statutory time period, the court determines that each of the above-described acts

2    constitute transfers under the first *Lawson* element.

3         Additionally, Defendant transferred $121,000.00 from Defendant's CNB Account

4    into the Clownsputsch Account, then transferred $119,000.00 from the Clownsputsch

5    Account back to Defendant's CNB Account.  The court determines that the net of

6    $2,000.00 that remained in the Clownsputsch Account constitutes a transfer under

7    *Lawson* because the $2,000.00 was disposed of or parted with, but the $119,000.00 that

8    was transferred back to Defendant's CNB Account does not constitute a transfer under

9    *Lawson* because that money did not remain in the Clownsputsch Account.  4 March,

10   Ahart and Shapiro, *California Practice Guide: Bankruptcy*, ¶ 22:856 at 22-118 (2015)

11   ("For purposes of § 727(a)(2), 'transferred' means 'transferred and *remained transferred*."

12   I.e., a debtor who fraudulently transfers property out of the bankruptcy estate during the

13   one-year prepetition period but then *returns the property to the estate* before filing the

14   petition may still receive a discharge.") (emphasis in original), *citing, In re Adeeb*, 787

15   F.2d at 1339, 1344-1345 (9th Cir. 1986).

16        **A.**      **Both Intent to Hinder and Intent to Delay are Individually**

17                  **Sufficient to Deny a Debtor's Discharge Under 11 U.S.C. §**

18                  **727(a)(2)**

19         Regarding the second *Lawson* element, the intent element, "[a] debtor's intent

20   does not need to be fraudulent to meet the requirements of 11 U.S.C. § 727(a)(2).  *In re*

21   *Retz*, 606 F.3d at 1200.  "Because the language of the statute is in the disjunctive, it is

22   sufficient if the debtor's intent is to hinder or delay a creditor."  *Id.*, *citing, In re Bernard*,

23   96 F.3d at 1281; *accord, In re Cooke,* 2016 WL 4039699, slip op. at *5; *see also,* 6

24   Resnick and Sommer, *Collier on Bankruptcy*, ¶ 727.02[3][a] at 727-17 (16th ed. 2016)

25   ("The language of section 727(a)(2), drawn from the Uniform Fraudulent Conveyance

26   Act, implies that the debtor must have intent to defraud a creditor or officer of the estate.

27   However, some courts have found that, under a literal reading of the language, an intent

28

to hinder or delay creditors, even if not fraudulent, may be sufficient to warrant denial of

discharge.") (footnotes and citations omitted), *citing inter alia, In re Retz, supra*; *First*

*Beverly Bank v. Adeeb,* 787 F.2d 1339, 1343 (9th Cir. 1986) (concluding that trial court's

finding that the debtor "acted with actual intent to hinder or delay a creditor" was not

clearly erroneous based on the debtor's admission that "he transferred the property

intending to put it out of the reach of one of his creditors"); *but see, In re Cooke,* 2016 WL

4039699, slip op. at *9 (Taylor, J., dissenting) (noting the bankruptcy court and the

majority opinion affirming the bankruptcy court "fail to cite a single reported Ninth Circuit

or Panel decision where a court denied discharge based on efforts to hinder or delay that

did not involve deceit or other objectively or subjectively improper conduct"); *cf., Acequia,*

*Inc. v. Clinton (In re Acequia, Inc.),* 34 F.3d 800, 804-812 (9th Cir. 1994) (reviewing for

clear error and affirming trial court's holding and sustaining reorganized debtor's

fraudulent transfer claims under 11 U.S.C. §§ 544(b) and 548(a)(1) against debtor's

insider as transferee of corporate funds based on factual findings that the insider caused

debtor to transfer the funds with intent to hinder or delay debtor's creditors); *Pioneer*

*Liquidating Corp. v. San Diego Trust & Savings Bank,* 211 B.R. 704, 717 (S.D. Cal. 1997)

(stating that "the purpose of fraudulent transfer recovery is to prevent a debtor from

putting assets otherwise available to its creditors out of their reach"), *citing and quoting,*

Jack F. Williams, *Revisiting the Proper Limits of Fraudulent Transfer Law,* 8 Bankr. Dev.

J. 55, 128 (1991) ("In our quest to understand fraudulent transfer liability, we often

overlook first principles.  At its core, fraudulent transfer law is a debt-collection device and

not a revenue generating tool; its mission is to prevent the unjust diminution of the

debtor's estate.").

      "The intent to hinder or delay [for purposes of 11 U.S.C. § 727(a)(2)(A)] 'is a

question of fact that requires the trier of fact to delve into the mind of the debtor and may

be inferred from surrounding circumstances.'"  *In re Cooke,* 2016 WL 4039699, slip op. at

*6, *citing, Searles v. Riley (In re Searles),* 317 B.R. 368, 379 (9th Cir. BAP 2004),

15

*affirmed in an unpublished decision,* 212 Fed. Appx. 589 (9th Cir. 2006), *citing, Emmett Valley Associates v. Woodfield (In re Woodfield)*, 978 F.2d 516, 518 (9th Cir. 1992). Furthermore, intent for purposes of 11 U.S.C. § 727(a)(2) may be inferred from the surrounding circumstances, including certain "badges of fraud" that constitute circumstantial evidence of intent:

> These factors, not all of which need be present, include 1) a close relationship between the transferor and the transferee; 2) that the transfer was in anticipation of a pending suit; 3) that the transferor Debtor was insolvent or in poor financial condition at the time; 4) that all or substantially all of the Debtor's property was transferred; 5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and 6) that the Debtor received inadequate consideration for the transfer.

*In re Woodfield*, 978 F.2d at 518, *citing inter alia, Evans v. Trude,* 193 Or. 648, 240 P.2d 940, 944 (1952) (citing state court cases listing "badges of "fraud" to infer actual intent to prove fraudulent transfer) and *Matter of Ayala,* 107 B.R. 274, 274-275 (Bankr. E.D. Cal. 1989) (citing federal court cases listing similar but not identical indicia of fraud to prove intent under 11 U.S.C. § 727(a)(2)).  "A course of conduct may also be probative of the question of intent."  *In re Beverly*, 374 B.R. at 243, *citing, In re Adeeb*, 787 F.2d at 1343.

As previously noted, *Collier on Bankruptcy* commented that the language of 11 U.S.C. § 727(a)(2) was drawn from the Uniform Fraudulent Conveyance Act and "implies that the debtor must have intent to defraud a creditor or officer of the estate", but that citing the Ninth Circuit in *In re Retz,* "some courts have found that, under a literal reading of the language, an intent to hinder or delay creditors, even if not fraudulent, may be sufficient to warrant denial of discharge."  6 Resnick and Sommer, *Collier on Bankruptcy*, ¶ 727.02[3][a] at 727-17 (footnotes and citations omitted).  In this court's view, *Collier*'s comment is somewhat overstated because the Uniform Fraudulent Conveyance Act, later the Uniform Fraudulent Transfer Act, and now the Uniform Voidable Transactions Act, does not draw any distinction in proving actual intent to prove a "fraudulent", now voidable, transfer, whether to hinder, to delay, or to defraud, because to prove any of

these forms of intent stated in the disjunctive may be proven by a common set of factors, or indicia, as indicated by the current California version of the Uniform Fraudulent Conveyance Act, now the Uniform Voidable Transactions Act, California Civil Code § 3439.04(a), which provides as follows:

> (a) A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:
>
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor.
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:
>
> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
>
> (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.
>
> (b) In determining actual intent under paragraph (1) of subdivision (a), consideration may be given, among other factors, to any or all of the following:
>
> (1) Whether the transfer or obligation was to an insider.
>
> (2) Whether the debtor retained possession or control of the property transferred after the transfer.
>
> (3) Whether the transfer or obligation was disclosed or concealed.
>
> (4) Whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
>
> (5) Whether the transfer was of substantially all the debtor's assets.
>
> (6) Whether the debtor absconded.
>
> (7) Whether the debtor removed or concealed assets.
>
> (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
>
> (9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

17

(10)    Whether the transfer occurred shortly before or shortly after a substantial debt was incurred.

(11) Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.

(c) A creditor making a claim for relief under subdivision (a) has the burden of proving the elements of the claim for relief by a preponderance of the evidence.

*See also,* 8 Witkin, *California Procedure,* Enforcement of Judgment, § 495 at 534-536 (2008 and 2016 Supp.); *cf.,* 5 Resnick and Sommer, *Collier on Bankruptcy*, ¶ 548.04[1][a] at 548-56 and n. 5 ("The statutory text [of 11 U.S.C. § 548(a)(1)(A)] focuses on the debtor's intent.  The debtor must possess an intent to hinder, an intent to delay or an intent to defraud.  The requirement is disjunctive; any one of the three intents is sufficient for liability." *citing inter alia*, *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 374 (S.D.N.Y. 2003) ("As the use of the disjunctive 'or' makes clear, '[o]nly an actual intent to hinder and delay need be established, not an actual intent to defraud.'") (citation omitted).

The words "hinder," "delay" and "defraud" used to describe the intent required under 11 U.S.C. § 727(a)(2) are not defined terms under the Bankruptcy Code.  *See* 11 U.S.C. § 101.  The meaning of these terms comes from the common law and is codified in the Uniform Fraudulent Conveyance Act, now the Uniform Voidable Transactions Act. *See In re Woodfield*, 978 F.2d at 518, *citing inter alia, Evans v. Trude, supra,* and *Matter of Ayala, supra.*  The terms of hinder, delay and defraud connote intentional actions by a debtor to frustrate or thwart collection by creditors and describe a continuum of intents that may differ temporally or in substance and effect, but each of which is impermissible for purposes of 11 U.S.C. § 727(a)(2).  The dictionary definitions of these words reinforce these observations.  The word "hinder" has been defined as a transitive verb: "1. To be or get in the way of.  2. To obstruct or delay the progress of."  *The American Heritage Dictionary of the English Language* at 830 (4th ed. 2006).  The word "delay" has been defined as a transitive verb: "1. To postpone until a later time; defer.  2. To cause to be later or slower than expected or desired."  *Id.* at 480.  The word "defraud" has been defined as a transitive verb: "To take something by fraud; swindle."  *Id.* at 477.  The word

1  "fraud", in turn, has been defined as a noun: "1. A deception deliberately practiced in

2  order to secure unfair or unlawful gain.  2. A piece of trickery; a trick . . . ."  *Id.* at 699.

3          **B.**     **An Examination of *In re Cooke* and *Hultman v. Tevis*: the Court**

4               **May Consider Prepetition Preferential Payments to Creditors for**

5               **Purposes of Determining Whether There is Intent to Hinder,**

6               **Delay or Defraud Under 11 U.S.C. § 727(a)(2)(A)**

7        Before the court addresses whether, under *Lawson*, Defendant's pre-bankruptcy

8  acts of using non-exempt assets to pay, and thus prefer, some creditors, including the

9  home loan lenders holding the First and Second DOTs on the Property, and his friends

10  as well as an insider, his wife, involved the requisite actual intent to hinder, delay or

11  defraud a creditor, the court must also carefully consider the overlay between the intent

12  to prefer creditors and the intent to hinder, delay or defraud creditors.  "The intent to

13  prefer creditors is not equivalent to the intent to hinder, delay or defraud creditors."  6

14  Resnick and Sommer, *Collier on Bankruptcy*, ¶ 727.02[3][c] at 727-19, *citing inter alia*,

15  *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301 (11th Cir. 1994) and *In re Richter*, 57

16  F.2d 159 (2d Cir. 1932); *see also, In re Chu*, 511 B.R. 681, 685 (Bankr. D. Hawaii 2014)

17  ("An intent to prefer one creditor over others is not necessarily the same as an intent to

18  hinder, delay, or defraud creditors.").  A transfer preferring one creditor over another does

19  not amount to an act to "hinder, delay, or defraud" an unpreferred creditor.  8 Witkin,

20  *California Procedure,* Enforcement of Judgment, § 495 at 534, *citing inter alia,* California

21  Civil Code § 3432 and *Wyzard v. Goller,* 23 Cal.App.4th 1183 (1994); *see also, Hultman*

22  *v. Tevis*, 82 F.2d 940, 941 (9th Cir. 1936) (mere fact of a preferential transfer does not

23  establish an act to "hinder, delay or defraud" creditor to deny discharge).  Nonetheless, in

24  this court's view, as discussed below, even if the intent to prefer creditors is not

25  equivalent to the intent to hinder, delay or defraud creditors, the intent to prefer creditors

26  may still coincide with the intent to hinder, delay or defraud creditors if there is other

27  evidence of intent as was recently held by a divided Bankruptcy Appellate Panel of the

28

                         19

Ninth Circuit ("BAP") in an unpublished memorandum decision in *In re Cooke,* 2016 WL

4039699, slip op. at *1-8 (majority opinion) and at *8-17 (Taylor, J., dissenting), affirming

a decision of another judge of this court (the Honorable Peter H. Carroll); *cf.,* 5 Resnick

and Sommer, *Collier on Bankruptcy,* ¶ 548.04[1][a] at 548-57 and n. 6 ("The requisite

actual intent [to hinder, delay or defraud to prove fraudulent transfer under 11 U.S.C. §

548(a)(1)(A)], however, must be something more than just an intent to prefer one creditor

over another." *citing inter alia*, *Stone v. Abraham (In re Prestige Spring Corp.)*, 628 F.2d

840, 842-843 (4th Cir. 1980).  For purposes of determining whether the court may

consider prepetition preferential payments to creditors when determining whether there is

intent to hinder, delay or defraud under 11 U.S.C. § 727(a)(2)(A), the court now examines

the BAP's decision in *Cooke* and the Ninth Circuit's decision in *Hultman*.

In *Cooke,* the debtor and the judgment creditor were involved in a multi-vehicle

accident in which the creditor, a former fireman, was seriously and permanently injured.

*Id.,* slip op. at *1.  The judgment creditor sued the debtor in state court for negligence and

the debtor who was insured was defended by the counsel retained by the insurance

company.  *Id.*  The state court entered a judgment in favor of the judgment creditor

against the debtor of $1.6 million, and in October 2012, the insurance company paid the

judgment creditor directly the amount of the policy limits of $250,000.  *Id.*  The debtor's

insurance policy also provided for certain supplemental payments to be made on behalf

of the debtor as the insured, including postjudgment interest, which was $45,147.62 as of

the date the insurance company paid the judgment creditor on the judgment.  *Id.*  On

November 13, 2012, the insurer mailed a check for the postjudgment interest to the

debtor, who deposited the check in his checking account on November 19, 2012.  *Id.,* slip

op at *1-2.  On November 30, 2012, the debtor filed a Chapter 7 bankruptcy case in this

court; however, shortly before filing his Chapter 7 bankruptcy case, he spent

approximately $30,000 from the insurance payment not to the judgment creditor on the

judgment, but for other purposes, including: (1) $1,040 in cash paid for miscellaneous

20

items, $1,040; (2) $5,600 for on-campus housing at the university he was attending for

the upcoming quarter; (3) $4,670 for tuition and fees to the university for the upcoming

quarter; (4) $11,000 for taxes on the insurance payment he received, which was paid to

the IRS; (5) $4,306 for bankruptcy attorney and filing fees; (6) $2,800 for taxes on the

insurance payment he received, which was paid to the state taxing authority; and (7)

$2,500 for the purchase of a personal computer for his use. *Id.,* slip op at *2.  The debtor

claimed the remaining amount of $14,250 as exempt on his bankruptcy schedules. *Id.*

The judgment creditor filed an adversary proceeding under 11 U.S.C. § 727(a)(2) against

the debtor to deny his discharge. *Id.,* slip op at *3.  During his meeting of creditors under

11 U.S.C. § 341(a), during an examination under Federal Rule of Bankruptcy Procedure

2004 by the judgment creditor and during the trial in the adversary proceeding, the debtor

gave inconsistent testimony about whether he received and read the letter from the

insurance company transmitting the supplemental payment check which told him what

the check was for before depositing the check into his account, and he admitted in his

testimony that he knew the insurance payment he received represented the interest

accrued from the judgment creditor's judgment, that based on his attorney's advice

(never disclosed due to the continued assertion of the attorney-client privilege), the

debtor concluded that the money from the insurance payment belonged to him and not

the judgment creditor, that the judgment creditor might try to collect the money and that

he could have given the money to the judgment creditor, but elected to use the money for

other purposes, and that he contemplated filing for bankruptcy before depositing the

check. *Id.* and n. 5.

 Among other things, the bankruptcy court in *Cooke* found that the debtor intended

to hinder or delay the judgment creditor in his ability to collect on the judgment by

transferring the funds.  *Id.*  Based on the totality of the circumstances, the bankruptcy

court believed that the debtor's transfers went beyond legitimate prebankruptcy planning

and were done with the intent to keep the funds from the judgment creditor, his most

21

1   significant creditor, and to maximize the benefit of the funds for himself.  *Id.* at *8.  The

2   bankruptcy court entered judgment in favor of the judgment creditor, denying the debtor

3   his discharge under 11 U.S.C. § 727(a)(2), and the Bankruptcy Appellate Panel in a

4   divided vote affirmed.

5        In affirming the bankruptcy court's judgment denying the discharge, the majority in

6   *Cooke* held that the bankruptcy court applied the correct law articulating the elements for

7   a claim under 11 U.S.C. § 727(a)(2) and made the necessary findings of fact to

8   determine the debtor's actual intent to hinder or delay the creditor, including inferences

9   and course of conduct that may be considered as circumstantial evidence of intent.  *Id.* at

10  *8.  "The party objecting to discharge under § 727(a)(2)(A) must prove two things: (1) the

11  disposition of property, whether by transfer, removal, destruction, mutilation or

12  concealment (within the statutory time period); and (2) the debtor's subjective intent to

13  hinder, delay or defraud a creditor through the act of disposition of the property."  *Id.* at

14  *5, *citing, In re Retz*, 606 F.3d at 1200, *citing, In re Lawson,* 122 F.3d at 1240.  As to the

15  second *Lawson* element, the majority held that the bankruptcy court's factual findings of

16  intent were not clearly erroneous because the court could properly have found actual

17  intent to hinder or delay based on the facts and debtor's course of conduct that he made

18  the transfers with the knowledge that he was liable to the judgment creditor in excess of

19  the policy limits, that the supplemental insurance payment was for accrued interest on the

20  judgment owed to the judgment creditor, that the judgment creditor might try to collect the

21  payment from him, that he did not want the judgment creditor to get the payment, and

22  that the debt owed to the judgment creditor was the reason he filed for bankruptcy as he

23  had no other material debt as of the petition date.  *Id.* at *6.  The majority finally observed

24  that "[a]lthough two views of the evidence may exist, the court's choice between them in

25  determining that [the debtor] actually intended to hinder or delay, cannot be clearly

26  erroneous."  *Id.* at *8.

27       ///

28

The dissent in *Cooke* observed that the critical inquiry in the case came down to the question of "what did [the debtor] do with the Funds that would justify the loss of discharge?", and the dissent's answer was that "he did nothing that was an appropriate basis for discharge denial under § 727(a)(2)(A)." *Id.* at *9. Among the eleven reasons that the dissent gave for reversal and possible remand of the bankruptcy court's judgment denying discharge was that reversal is warranted as a matter of law because the bankruptcy court's factual finding of intent was based on transfers which it could not consider for purposes of § 727(a)(2)(A). *Id.* at *9-17.

The debtor in *Cooke* has appealed the judgment of the Bankruptcy Appellate Panel affirming the bankruptcy court to the Ninth Circuit, which will decide the appeal in due course. This court specifically addresses some of the concerns raised in *Cooke* which are germane to the discussion of the issues in this case, particularly whether reversal is warranted as a matter of law because the bankruptcy court's factual finding of intent was based on transfers which it could not consider for purposes of 11 U.S.C. § 727(a)(2)(A), and in support of that ground for reversal, the dissent in *Cooke* cited the Ninth Circuit's decision in *Hultman v. Tevis, supra,* which was decided under the Bankruptcy Act of 1898 rather than the modern Bankruptcy Code.

The facts in *Hultman v. Tevis* were as follows. 82 F.2d at 940-941. The debtor filed a petition for relief under the Bankruptcy Act and was adjudged a voluntary bankrupt. *Id.* at 940. The trustee in bankruptcy opposed the petition and sought denial of the debtor's discharge on two grounds, including the transfer of large sums of money within one year of the petition date to his son with the intent to hinder, delay or defraud his creditors. *Id.* at 940-941*, citing,* Bankruptcy Act of 1898, § 14b, as amended by § 6 of the Act of May 27, 1926, c. 406, 44 Stat. 663, former 11 U.S.C § 32(b). The debtor owed a debt to his son, which had not been fully paid. *Id.* at 941. Debtor began receiving money from a spendthrift trust set up by his sister, and he transferred some of that money to his son within one year of the petition date. *Id.* The debtor had been advised by his

23

attorney, to whom all the facts were fully disclosed, that the money received from the

spendthrift trust could not be subjected to the claims of his creditors, even after it reached

his hands.  *Id.*  The debtor in good faith believed and relied upon the attorney's advice

and acted on it in making the transfer to his son.  *Id.*  The amount of money that the

debtor transferred to his son was less than the amount owed.  *Id.*  The special master in

bankruptcy made the above findings of fact, which were not excepted to at trial, and

further found that the money which the debtor transferred to his son was not transferred

with the intent to hinder, delay or defraud his creditors and that the debtor was entitled to

a discharge of his debts.  *Id.*  The trustee in bankruptcy interposed exceptions to the

special master's findings of fact and conclusions of law, but the district court accepted the

special master's findings and conclusions granting the debtor a discharge.  *Id.*  The Ninth

Circuit in *Hultman* affirmed the district court's judgment upholding the debtor's discharge.

In so holding, the Ninth Circuit made two specific observations germane here.  *Id.*  First,

the Ninth Circuit stated: "Whether [the lawyer's] advice was correct or not is a question

which the District Court did not, nor do we, deem it necessary to decide."  *Id.*  Second,

the Ninth Circuit stated: "The mere fact that a bankrupt has made a preferential payment

or transfer to one of his creditors is no ground for denying a discharge."  *Id.* (citations

omitted).

   The dissent in *Cooke* concluded that "[t]he bankruptcy court here did not

acknowledge the rule in *Hultman* and erroneously relied on [the debtor]'s use of the

Funds to pay other creditors."  *In re Cooke,* 2016 WL 4039699, slip op. at *11 (Taylor, J.,

dissenting).  The dissent in *Cooke* asserted that the majority opinion only addressed one

of the two relevant rulings of the Ninth Circuit in *Hultman* for not denying the debtor's

discharge based on reliance of counsel and simply disregarded the other relevant ruling

relating to preferential payments.  *Id.*  Relying on the Ninth Circuit's statement in *Hultman*

that "[t]hat the mere fact that a bankruptcy has made a preferential payment or transfer to

one of his creditors is no grounds for denying a discharge," the dissent in *Cooke* stated:

24

"*Hultman* clearly states that payment of legitimate creditor claims, even to insiders, is not a basis for discharge denial.  Both the bankruptcy court and the majority ignore this authority; I cannot and do not do so."  *Id.*  In other words, as the dissent stated, "as the Ninth Circuit made clear in *Hultman,* some transfers do not support discharge denial as a matter of law."  *Id.* at *12 n. 4.

In asserting that reversal in *Cooke* was warranted as a matter of law because the bankruptcy court's factual finding was based on transfers which it could not consider for purposes of 11 U.S.C. § 727(a)(2)(A), the dissent in *Cooke* also criticized the majority's analysis based on another Ninth Circuit decision in *In re Adeeb, supra.  Id.* at *14.  The dissent stated:

> In summary, I would reverse because the bankruptcy court erred as a matter of law when it based its decision almost entirely on [the debtor]'s payment of other debt.  *Hultman,* as recognized by this Panel, does not permit this reliance.  I also conclude that the laptop computer acquisition in isolation did not justify § 727(a)(2)(A) denial of discharge.
>
> I emphasize that my analysis is independent of the bankruptcy court's finding of intent.  As already noted, all commencements of bankruptcy cases involve, to some extent, an express intent to hinder and delay a creditor.  Further, almost all bankruptcy cases involve some measure of transfer in anticipation of the creditor-hindering-or-creditor-delaying bankruptcy; bankruptcy lawyers are paid, creditors are preferred, and in some reasonable regards non-exempt assets become exempt or goods or services essential to day-to-day existence are obtained.  These types of transfers do not justify a denial of discharge, so one never need consider a debtor's intent when causing them.  And *Hultman* provides a firm foundation for a determination that not all transfers are appropriately considered in a § 727(a)(2)(A) context.  *Adeeb* is another such case.
>
> In *Adeeb,* the debtor admitted to making pre-petition transfers with improper intent.  787 F.2d at 1341-42.  But, he repented and attempted to retrieve the assets.  *Id.*  The Ninth Circuit, thus, reversed the district court and remanded to the bankruptcy court for a determination as to whether recovery had been complete.  *Id.* at 1346.  The Ninth Circuit read transferred in § 727(a)(2)(A) as meaning 'transferred and remained transferred.'  *Id.* at 1345.  And it noted that Congress intended to deny discharge where debtors took actions **to keep assets from their creditors** by hiding assets or destroying them.  *Id.*  The facts here evidence no such improper conduct.  Instead, in *Hultman,* the transfers did not support §727(a)(2)(A) discharge denial.

*Id.* at *14 (emphasis in original).

1   With respect to the debtor's use of the insurance payment funds to purchase a

2   laptop computer, the dissent in *Cooke* commented:

> Moreover, the Ninth Circuit allows debtors to engage in some forms from
> pre-bankruptcy planning and to protect assets by converting them from
> non-exempt to exempt. *See, e.g., Gill v. Stern (In re Stern),* 345 F.3d
> 1036, 1043 (9th Cir. 2003) ("[T]he purposeful conversion of nonexempt
> assets to exempt assets on the eve of bankruptcy is not fraudulent per
> se." (quoting *Wudrick v. Clements,* 451 F.2d 988, 989 (9th Cir. 1971)).
> The bankruptcy court acknowledged this fact, stating that this was a close
> case, but finding that combined expenditures from the Funds tipped the
> balance towards a denial of discharge.  In a close case, the bankruptcy
> court could not find that the purchase of a much-needed tool of [the
> debtor]'s trade as a student, one that involved use of less than ten percent
> of the Funds, justified discharge denial.

*Id.* (footnote omitted).

   In response to the dissent's analysis, the majority in *Cooke* stated that "[i]n the

requisite analysis for this appeal, we need to determine if the bankruptcy court's finding of

actual intent was clear error."  *Id.* at *7 n. 7.  In addressing the dissent's analysis, citing

*Hultman,* the majority stated:

> The dissent's analysis doesn't consider intent, but rather questions
> whether any transfers contemplated by § 727(a)(2) occurred if the
> transfers constitute preferment of other creditors. *See Hultman v. Tevis,*
> 82 F.2d 940, 941 (9th Cir. 1936).  As noted in *First Beverly Bank v. Adeeb
> (In re Adeeb),* 787 F.2d 1339, 1343 (9th Cir. 1986), the real issue in
> *Hultman* involved whether the debtor acted with the requisite intent when
> he "in good faith, believed and relied upon his attorney's advice and acted
> on it in making the transfer to his son."  *Id.*  The Hultman court concludes
> no other indicia of intent existed, warranting a discharge.  The facts in this
> present appeal distinguish this appeal from *Hultman.*  Although [the
> debtor] vaguely raised an advice of counsel defense, he inconsistently
> testified as to whether he talked to his counsel.  Further he declined to
> waive his attorney-client privilege so [the attorney] could testify or submit a
> declaration as to his advice to [the debtor].  However, in raising such a
> defense, [the debtor] could not invoke an attorney-client privilege.
> *Chevron Corp. v. Pennzoil Co.,* 974 F.2d 1156, 1163 (9th Cir. 1992).

*Id.* at *5 n. 5.

   With respect to the bankruptcy court's factual findings on intent, the majority in

*Cooke* noted that "[b]eyond the credibility determination, the bankruptcy court also

identified several elements as support for the inference that [the debtor] acted with the

26

1    requisite intent under § 727(a)(2)(A)," citing what the bankruptcy court considered as

2    reflected in the trial transcript:

3        The bankruptcy court considered: "(1) the timing of the transfer; (2) the
         amount of the transfer in relation to the remaining property of the debtor;
4        (3) whether the transfer occurred after the entry of a large judgment
         against the debtor; (4) whether the transfer rendered the debtor insolvent;
5        (5) the debtor's motivation to make the transfers; and (6) the credibility of
         the debtor's explanation regarding the transfers."
6
     *Id.* at *7 and n. 6, *citing,* Trial Tr. (Jan.12, 2015) 10:23–11:5.
7
         This court has quoted the dissent and majority opinions in *Cooke* at length
8
     because the issues raised are germane to this case, that is, whether, as the dissent in
9
     *Cooke* concluded, based on the Ninth Circuit's decision in *Hultman* that some transfers
10
     by a bankruptcy debtor, including preferential payments to other creditors, do not support
11
     discharge denial as a matter of law.  In considering the merits of the analyses of the
12
     majority and dissent in *Cooke,* this court concludes that while the dissent makes cogent
13
     points, the majority has the better side of the argument.  The majority in *Cooke* is correct
14
     in emphasizing that "[i]n the requisite analysis for this appeal, we need to determine if the
15
     bankruptcy court's finding of actual intent was clear error."  The bankruptcy court's
16
     analysis based on its findings considering  "(1) the timing of the transfer; (2) the amount
17
     of the transfer in relation to the remaining property of the debtor; (3) whether the transfer
18
     occurred after the entry of a large judgment against the debtor; (4) whether the transfer
19
     rendered the debtor insolvent; (5) the debtor's motivation to make the transfers; and (6)
20
     the credibility of the debtor's explanation regarding the transfers" was not clear error,
21
     though a reasonable finder of fact could decide differently.  *Id.*
22
         In this court's view, *Hultman* does not dictate a different result in *Cooke* or in this
23
     case.  The Ninth Circuit's statement in *Hultman* that "[t]hat the mere fact that a
24
     bankruptcy has made a preferential payment or transfer to one of his creditors is no
25
     grounds for denying a discharge" does not support the broad reliance of the dissent in
26
     *Cooke* for its proposition that preferential transfers do not support discharge denial as a
27
     matter of law and cannot be considered for determining intent for purposes of 11 U.S.C. §
28
                                          27

727(a)(2)(A). That is not what the Ninth Circuit said in *Hultman*.  As worded, the Ninth

Circuit's statement in *Hultman* that the mere fact of a preferential transfer does not justify

discharge denial means that such a transfer by itself is not grounds to deny a discharge,

but says nothing about a preferential transfer being considered as evidence of intent in

the context of other facts that may evidence intent.  The analysis in *Hultman* indicated

that the appropriate inquiry was to determine the existence of an intent on behalf of the

debtor to hinder, delay or defraud creditors, which is a fact-based inquiry, and the

findings of fact and conclusions of law proposed by the special master adopted by the

district court that the debtor lacked such intent was reviewed for clear error, which was

affirmed by the Ninth Circuit.  The *Cooke* majority's analysis of *Hultman* was correct that

the district court's finding of lack of intent based on the debtor's reliance on counsel's

advice without other evidence of intent was not clearly erroneous and was appropriately

affirmed.  *See also, In re Perrine,* 2008 WL 8448835, slip op. at *5-6 (9th Cir. BAP 2008)

(unpublished BAP memorandum decision discussing *Hultman* and acknowledging the

Ninth Circuit's determination in that case that the fact that a preferential payment did not

necessitate a finding that it was made with an intent to hinder or delay creditors,

upholding the district court's finding of lack of intent without additional evidence of intent,

but distinguishing *Hultman* on its facts to uphold discharge denial involving a preferential

or fraudulent transfer with additional evidence of intent).

  The court acknowledges what the Ninth Circuit stated in *Hultman* about the *mere*

fact that a preferential transfer is not a ground to deny a discharge under 11 U.S.C. §

727(a)(2)(A), but the circumstantial evidence in this case supports a finding that

Defendant made transfers to prefer creditors, including the home loan lenders holding the

First and Second DOTs on the Property and his wife, with the intent to hinder, delay or

defraud creditors beyond the mere fact that he made certain preferential transfers to

other creditors and, as discussed in more detail below, beyond the mere fact that he

converted nonexempt assets into exempt assets.

28

### C.    Based on *In re Beverly*, Defendant "Crossed the Line"

Beyond the previous determination that the court may consider preferential payments to creditors for purposes of determining an intent to hinder, delay or defraud under 11 U.S.C. § 727(a)(2)(A), the court is persuaded by the decision and analysis of the Bankruptcy Appellate Panel for the Ninth Circuit ("BAP") in *In re Beverly*, which dealt with another issue that is relevant to this case: whether the pre-bankruptcy conversion of non-exempt assets into exempt assets, which is nonfraudulent by itself as a matter of law under the Ninth Circuit's decision in *Gill v. Stern (In re Stern)*, 345 F.3d 1036, 1044 (9th Cir. 2003), warrants denial of a bankruptcy debtor's discharge if there was also a subjective intent to hinder, delay or defraud a creditor. *In re Beverly,* 374 B.R. at 242-246.  The court believes the BAP's framework in that case is instructive here because in addition to Defendant's use of non-exempt assets to prefer certain creditors prepetition, this case also involves the transfer of non-exempt assets to Defendant's Wife's CNB Account which Defendant claimed an exemption in.  As discussed in more detail below, the totality of circumstantial evidence in this case shows an intent to hinder, delay or defraud creditors to warrant denial of discharge as shown by Defendant's prepayments of the First and Second DOTs with five advance monthly payments, and transfers to his Wife's CNB Account which Defendant claimed an exemption in, all of which, like in *Beverly*, are forms of improper pre-bankruptcy planning that furthered Defendant's intent to keep certain assets for his personal benefit and out of reach of his creditors who might have received the value of these assets through a bankruptcy distribution.

In *Beverly*, the BAP reversed the bankruptcy court's holding that the debtor's pre-bankruptcy conversion of non-exempt assets to exempt assets during the debtor's divorce was non-fraudulent as a matter of law for purposes of denying the debtor's discharge under 11 U.S.C. § 727(a)(2). *Id.* at 246.  In *Beverly*, the facts were as follows. The debtor, anticipating a large judgment on a community debt, executed a marital settlement agreement with his wife prepetition whereby he transferred a $1 million

interest of non-exempt property to his non-filing wife in exchange for his wife's interest in

his $1.1 million exempt retirement fund.  *Id.* at 226-227.  By doing so, the debtor would

shoulder the impending judgment debt, but having first stripped himself of the non-

exempt liquid assets with which to pay that debt.  *Id.* at 227.  After the debtor filed for

bankruptcy, the trustee and the judgment creditor objected to the debtor's discharge

under various 11 U.S.C. § 727(a) theories.  *Id.* at 229.  The bankruptcy court ruled for the

debtor, reasoning that the toleration of bankruptcy exemption planning meant that the

discharge cannot be denied because there could not have been an intent to hinder, delay

or defraud creditors.  *Id.* at 244.

On the creditor's appeal of its 11 U.S.C. § 727(a)(2)(A) claim, the BAP in *Beverly*

specifically addressed the relationship between the conversion of non-exempt assets to

exempt assets, which is not by itself fraudulent, and an intent to defraud creditors,

stating:

> [I]t is difficult to draw the line between legitimate bankruptcy planning and intent to defraud creditors.  Only two things are certain about the line.
>
> First, as already explained, denial of discharge involving exemption planning requires that there be evidence other than the mere timing of the transformation of property from nonexempt to exempt status.
>
> Second, there is a principle of "too much."  In classical terms, it is the Sword of Damocles.  In the agrarian terms used by the Fifth Circuit affirming the denial of a discharge, "when a pig becomes a hog it is slaughtered."
>
> The reality is that cases finding discharge-disqualifying intent to hinder, delay, or defraud creditors typically involve some combination of large claims of exemption and overtones of overreaching.

*Id.* at 245 (citations omitted).  Based upon the fact of the debtor's conversion of at least

$424,450 in non-exempt assets to exempt assets and a record replete with evidence that

the debtor was fixated on moving assets away from the reach of the judgment creditor,

the BAP in *Beverly* held that the bankruptcy court's factual finding that the debtor did not

have the requisite intent to hinder or delay the judgment creditor was clearly erroneous.

*Id.* at 245.  In so holding, the court stated,

30

> [t]here is a remarkably large volume of evidence of [the debtor]'s intent to hinder or delay that is extrinsic from the fact that he transferred nonexempt property for exempt property in the MSA.  As a result, it is beyond cavil that [the debtor]'s intent was to become judgment proof and not just to protect his assets.

*Id.* at 246.

Based on the BAP's analytical framework in *Beverly* regarding the relationship between a debtor's intent and the conversion of assets from nonexempt to exempt status, and based on additional evidence of intent beyond the mere conversion of assets from nonexempt to exempt, the court considers, as discussed below, whether Defendant "crossed the line" based on additional evidence of intent beyond the mere fact that some of the transfers appear to be preferential only when Defendant used his non-exempt assets to make prepetition transfers to preferred payees when he made five months of prepayments to his home lenders totaling $51,000.00 and transferred $38,000.00 to two of his friends on debts allegedly owed to each of them, as well as when Defendant converted non-exempt assets to exempt assets by transferring $86,000.00 to his Wife's CNB Account which Defendant claimed an exemption in.

### i. Defendant's Prepayments of First and Second DOTs on the Property

Regarding the additional evidence of intent beyond the mere preferential payments and conversion of nonexempt assets to exempt assets, and specifically, Defendant's act of prepaying the First and Second DOTs on his home, the court first notes that aside from the timing of Defendant's prepetition transfers of nonexempt assets and the amounts of those transfers, he made multiple admissions in his trial testimony that evidence his intent to hinder or delay his non-preferred creditors.  "When a debtor admits that he acted with the intent penalized by section 727(a)(2)(A), there is no need for the court to rely on circumstantial evidence or inferences in determining whether the debtor had the requisite intent."  *In re Adeeb*, 787 F.2d at 1343 ("Adeeb admitted that he transferred the property intending to put it out of the reach of one of his creditors.").  Additionally, entry of a discharge order should be denied if a debtor "had the intent

31

penalized by the statute notwithstanding any other motivation he may have had for the transfer." *Id.* at 1343; *accord, In re Beverly*, 374 B.R. at 246; *cf. Matter of Trinity Baptist Church,* 25 B.R. 529, 532-533 (Bankr. M.D. Fla. 1982) (analyzing fraudulent transfer claim under Florida law) ("Intent to defraud within the meaning of the statute is the debtor's intention to prevent his creditors from satisfying their debts . . . An evil motive is not required in order to set aside a transfer.") (citations omitted).

Specifically, at his Rule 2004 examination, Defendant testified to the following:

Well, at the time that the payments were made – let's see. . . . July was the prepayment[,] by then the case had been decided, and I didn't know what I was going to do. Really, we were trying to make up our mind what we were going to do, and then I just wanted to make sure that those -- that whatever happened -- I mean, I got a threatening letter. I got threatening letters from the beginnings of what might have been attempts to collect money or whatever, and I just wanted to make sure that we wouldn't be thrown out in the street.

Well, I got -- well, the award in and of itself was pretty breathtaking. When I got the notice of the award, that was F.I.N.R.A., and the F.I.N.R.A. fees. I didn't know if I would lose my license. I didn't. J.P. Morgan, obviously, they had sent me by July -- yeah. They had sent me a letter by then saying they wanted their money. And who else was there? I was having a fee disputes. That's another thing. I was having a fee dispute. I found out that I was grossly overcharged by the attorneys I used first, and I got several attorneys' opinions, and so I was possibly fighting with them. Whatever else was going to go on, I wanted to make sure my family was at least ensconced in our home until the end of the year.
[. . .]

Its a priority of survival. I wanted to make sure we had a home to live in and a place to live in while all this was going on.

Well, I didn't know if, for example, Shustak had gotten a judgment, which he didn't. They threw him out of court, but he kept trying to do things. I didn't know where -- I felt under siege. I guess you can understand that. So I had to prioritize where this money went, and other than food and other -- certain other things that had to be accounted -- you know, taken care of. This was a pretty important piece of that puzzle.

Furthermore, at trial, Defendant testified that he thought of prepaying his home loans by five months because "I had the money at that time and I wanted to make sure my family was protected and that I had paid my primary obligation to them for that period of time", *Trial Testimony of Joseph Ellison*, November 19, 2015 at 9:22 a.m., and that a primary motivation behind his prepayments was that he was concerned about his prior

lawyer, Shustak, who he was having a fee dispute with, and who has a disputed claim in

Defendant's bankruptcy case, "from coming in and attaching his assets", *Trial Testimony*

*of Joseph Ellison*, November 19, 2015 at 9:24-9:25 a.m.  *In re Adeeb*, 787 F.2d at 1343

("Adeeb admitted that he transferred the property intending to put it out of the reach of

one of his creditors.").  Although Defendant had a benign motive of protecting his family,

the evidence otherwise indicates that he still had the intent to hinder or delay his

creditors.  *Matter of Trinity Baptist Church,* 25 B.R. at 532-533 (mixed motive of a debtor

does not defeat a finding of intent, stating: "Clearly, the Debtor intended to hold those

dissatisfied creditors at bay, and prevent levy and sale of the property, in hopes of

rehabilitation and the satisfaction of all creditors.  While admirable, the end result of this

scheme was nonetheless hindrance and delay of creditors.").

Moreover, Defendant testified that he prepaid the home loans secured by the First

and Second DOTs "to assure that my wife and my daughter and myself had a home to

live in through the end of the year . . .  I did prepay [the mortgage in the past] but not to

that degree, not six months, or four months, five months, whatever it was in advance,

normally."  *Trial Testimony of Joseph Ellison*, November 19, 2015 at 10:43 a.m.  This out

of the ordinary course transaction and Defendant's admissions are additional evidence of

his intent to hinder or delay his creditors by putting these funds out of their reach for his

personal benefit.  *Silagy v. Morris (In re Morris),* 2013 WL 5705630, slip op. at *17

(Bankr. N.D. Ohio 2013) (transfers of debtor's property in exchange for waiver of future

child support was a badge of fraud due to detriment of debtor's current creditors

indicating intent to hinder, delay or defraud creditors as fraudulent transfer under 11

U.S.C. § 548(a)(1)(A)), *objections to bankruptcy court's proposed findings of fact and*

*conclusions of law overruled in pertinent part and sustained in part on other grounds,*

2015 WL 853499 (N.D. Ohio 2015).  In holding that the debtor's transfers of her equity in

the marital residence to her spouse in a martial dissolution for a waiver of her future child

33

1  support obligations was a badge of fraud with respect to her current creditors, the

2  bankruptcy court stated in *In re Morris*:

> Debtor's actions amount to accelerating an unmatured, future obligation and
> allowed her to prepay it.  Assets that were immediately available, equity in
> the real estate, were traded for a future obligation that has not yet come
> due. This is little different than allowing a debtor to prepay ten years of rent
> or any other future expense saving tactic at the expense of current creditors
> holding liquidated, matured debts.  While this action has not been previously
> listed as a badge of fraud, under the particular facts of this case, the court
> finds that the transaction increases the overall likelihood of actual fraudulent
> intent.

8  2013 WL 5705630, slip op. at *17.  The court in *In re Morris* also held that the transfer

9  was also constructively fraudulent because prepayment of a future obligation was not

10  reasonably equivalent value and the transfer harmed creditors:

> . . . Debtor should not be able to reduce the amount she will pay to her
> current creditors by either obtaining a waiver of a future obligation or
> withholding money to satisfy a future debt.  For example, a debtor should
> not be allowed to set aside money for her next five years of rent under the
> guise that the money will be used to pay her future creditor (the landlord) at
> the expense of her current creditors.  In *In re Strasser,* a debtor moved
> $62,000 out of reach of her current creditors by transferring the money to
> her father, who then gave the money back to the debtor for the payment of
> her living expenses.  303 B.R. 841, 847-48 (Bankr. D. Ariz. 2004).  The
> court held that the debtor should not be able to harm her current creditors
> by withholding money under the guise that the property would be used to
> pay her future expenses, and therefore her future creditors.  *Id.*  Such an
> action is putting money out of the reach of current creditors, and then
> claiming 'no harm no foul, I used it on my future creditors.'  *Id.* (internal
> quotation marks omitted).  While the facts are different in the current case,
> the theory is the same:  Debtor is not allowed to give significant value to her
> future creditors in order to harm her current creditors.  For the above
> reason, the court will not consider the waiver of the child support in
> calculating reasonable equivalence.

21  2013 WL 5705630, slip op. at *11.

22      Under the Uniform Fraudulent Transfer Act (now the Uniform Voidable

23  Transactions Act), a transfer is constructively fraudulent if the debtor made the transfer

24  without receiving a reasonably equivalent value for the transfer in exchange for the

25  transfer and the debtor was insolvent at the time of the transfer or became insolvent as

26  result of the transfer.  California Civil Code § 3439.05(a).  Although the finding of lack of

27  reasonably equivalent value was made in support of the holding of constructive

28

34

fraudulent transfer in *In re Morris,* though not directly relevant for a claim under 11 U.S.C. § 727(a)(2), such a finding would itself be a badge of fraud indicating actual intent to hinder, delay or defraud current creditors under the Uniform Fraudulent Transfer Act (now Uniform Voidable Transactions Act) and under the Ninth Circuit's listing of badges of fraud in *In re Woodfield, supra.* California Civil Code § 3439.04(b)(8) ("(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred."); *In re Woodfield,* 978 F.3d at 518 ("6) that the Debtor received inadequate consideration for the transfer.") (citations omitted).

Although Defendant might have argued that the prepayments of the home loans are not indicative of an intent to hinder, delay or defraud creditors because these payments to the home lenders were to fully secured creditors, the court would not be persuaded by such. *See Pioneer Liquidating Corp. v. San Diego Trust & Savings Bank,* 211 B.R. at 717 (S.D. Cal. 1997) (holding that payment to a fully secured creditor does not hinder, delay or defraud creditors because it does not put assets otherwise available in a bankruptcy distribution out of the reach of other creditors), *cited in, Henry v. Lehman Commercial Paper, Inc. (In re First Alliance Mortgage Co.),* 471 F.3d 977, 1008 (9th Cir. 2006). This argument fails under the circumstances of this case because Defendant had refinanced his existing home loans by taking out new home loans to repay the old ones and to extract and monetize the existing equity in his home that was otherwise available to pay his current creditors. Defendant took out the surplus refinancing proceeds, which were converted home equity, and transferred such proceeds for his personal purposes rather than to pay debt to current creditors. Defendant made transfers to his wife, and he made prepayments on his new home loans five months in advance as he admitted so he and his family had a place to live. Although the new home lenders are secured creditors, the liens they hold are based on trust deeds on the home as real property, and not on the surplus refinancing proceeds. Findings of Fact Nos. 18-22. Defendant's transfers in his

home loan prepayments from the refinancing proceeds were thus not payments of the

home lenders as fully secured creditors from their collateral, the home itself, which is

different from the circumstances in *Pioneer Liquidating Corp. v. San Diego Trust &*

*Savings Bank, supra,* where the fully secured lender was paid from its collateral on which

it had a security interest, which was held not to be a transfer involving an intent to hinder,

delay or defraud creditors since there was no diminution of the bankruptcy estate as the

transferred assets were fully encumbered by the secured creditor's lien.  This is not the

situation here because the funds used to make Defendant's home loan prepayments

were from the surplus refinancing proceeds from his converted home equity, which were

prepetition assets not encumbered by the home lenders' security interests, and thus,

these funds had been prepetition assets otherwise available to his current creditors which

he put out of their reach resulting in a diminution of the bankruptcy estate.  Why this is

overreaching and improper is that Defendant converted the prepetition asset of

nonexempt home equity available to pay prepetition debts for which he was legally

obligated to pay at the time into a postpetition asset by prepaying his future obligations

which were not yet legally due, thus, diminishing the pool of prepetition assets available

to pay current creditors otherwise barred from further collection due to the bankruptcy

discharge and relieving him of having to use his postpetition assets to pay debts for

which he had to pay in the future, but he did not yet have to pay at the time, and

conferring a financial benefit to him at the expense of his current creditors.  Accordingly,

the court finds on this record that Defendant's transfers of $41,415.30 and $11,062.00 to

prepay his home loans for five months are badges of fraud indicating an intent to hinder,

delay or defraud his current creditors, including JP Morgan Chase, by putting these

otherwise available assets out of the reach of these creditors and by not receiving

reasonably equivalent value in doing so.

Additionally, Defendant testified that prior to filing his bankruptcy petition, he met

with an asset protection firm, and one of his goals in doing so was to potentially protect

36

his assets from potential creditors.  *Trial Testimony of Joseph Ellison*, November 19, 2015 at 10:58-10:59 a.m.  These admitted facts of Defendant's knowledge and planning are additional evidence of his intent to hinder or delay his creditors.  Accordingly, based on the Ninth Circuit's decisions in *Adeeb* and *Retz*, the court determines that Defendant's admissions that he prepaid the home loans secured by the First and Second DOTs to prevent other creditors from gaining access to equity in the Property and collecting on those assets, constitutes additional and sufficient evidence of an actual intent to hinder, delay or defraud creditors beyond the mere fact of making preferential transfers, and thus, establishes a claim to deny Defendant's discharge under 11 U.S.C. § 727(a)(2)(A).  Furthermore, based on the analytical framework set forth in *Beverly*, the court also determines that such admissions constitute evidence of defendant's actual intent to hinder, delay or defraud his creditors beyond the mere fact of the timing of using non-exempt funds to prepay the home loans secured by the First and Second DOTs immediately before he filed for bankruptcy.

Defendant's admissions notwithstanding, the sequence of events preceding the filing of his bankruptcy petition provides circumstantial evidence of his actual intent to hinder or defraud his creditors.  *See In re Beverly*, 374 B.R. at 243 (for the purposes of 11 U.S.C. § 727(a)(2)(A), intent to hinder, delay, or defraud may be established by circumstantial evidence or by inferences drawn from a course of conduct); *In re Adeeb*, 787 F.2d at 1343, *citing, In re Devers*, 759 F.2d 751, 755 (9th Cir. 1985).  The Ninth Circuit in *Woodfield*  identified certain "badges of fraud" indicative of circumstantial evidence of an intent to hinder or defraud, which can be found here, including factors (1) a close relationship between the transferor (Debtor) and the transferee (his wife and friends); (2) that the transfers were in anticipation of a pending suit (Plaintiffs' counterclaims in the FINRA Action and suit to confirm their award); (3) that the transferor Debtor was insolvent or in poor financial condition at the time (Defendant's filing of his bankruptcy case with his schedules showing insufficient nonexempt assets to pay his

outstanding debts); (4) that all or substantially all of the Debtor's property was transferred (prepetition payment of preferred parties, his wife, his friends and his home lenders, and Debtor's conversion of nonexempt assets into exempt assets); (5) that the transfers so completely depleted the Debtor's assets that the creditors have been hindered or delayed in recovering any part of the judgment (reduction of most, if not all, value in nonexempt assets as of the petition date).  *In re Woodfield*, 978 F.2d at 518.

Defendant took out the equity from the Property and used the proceeds to pay his wife, friends, and the First DOT and the Second DOT on the Property so that his family could continue to retain the benefits of the funds and live in the Property.  As a result of Defendant depleting the equity in the Property through the refinancing and prepetition transfers, there is little or no equity in the Property available to pay nonpreferred creditors through Defendant's bankruptcy case.  Though the refinancing transactions, Defendant pulled out net equity of almost $250,000 from his residence, solving his practical problem of shielding the nonexempt equity from his creditors based on the limited $100,000 homestead exemption for Defendant and his spouse as a "family unit" under California Code of Civil Procedure § 704.730(a)(2).  Likewise, as a result of the transfers, the disbursed funds, which would have otherwise remained in Defendant's [unencumbered] CNB Account, are also unavailable for distribution to Defendant's unsecured creditors. Defendant's nonpreferred unsecured creditors, JPMorgan and Shustak, representing 90 percent of the value of Defendant's general unsecured claims, are thus likely to recover little or nothing from Defendant's bankruptcy estate in light of Defendant's prepetition transfers, while he continues to benefit from these transfers diverting his assets which would have otherwise been intended and available for distribution to these creditors in this bankruptcy case.

According to Defendant's bankruptcy schedules, his real property asset, the home, is fully encumbered, and of his personal property assets with a total value of $303,587.00, most of the value of these assets is claimed as exempt in the amount of

$254,673.00, leaving a net of $48,914.00 as non-exempt property.  Schedule A-Real Property, Schedule B-Personal Property, Schedule C-Property Claimed as Exempt, Petition, Exhibit 8 at 13-21.  Most of the value of Defendant's nonexempt assets comes from an account receivable valued at $35,914.00, which he says is owed from his former employer, Morgan Stanley, in company stock from a performance award, and is thus not traceable to the subject transfers from Defendant's converted home equity.   Schedule B-Personal Property, Petition, Exhibit 8 at 17.  In comparison, on March 1, 2014, Defendant received the funds of $247,950.85 disbursed to him from the refinancing of his home not claimed as exempt on his bankruptcy schedules representing the home equity that he took out and converted for his use, and not available to pay claims of current creditors, including the transfers discussed herein.  These circumstances indicate perfect prebankruptcy planning from Defendant's perspective because through the transfers, he was able to extract the net equity of almost $250,000 from his home and provide for himself and his family and his preferred creditors, leaving almost nothing for his nonpreferred creditors, despite the limited $100,000 homestead exemption, and are the result of Defendant's design and actual intent to hinder or delay his creditors.

Furthermore, the court also observes that the timing, quantity, and circumstances surrounding Defendant's transfers—which occurred while the FINRA Action was pending, while an evidentiary hearing was ongoing, while the issuance of an adverse FINRA award was imminent, and shortly after the issuance of the FINRA award, highlight that Defendant made the transfers intending to hinder creditors' ability to recover from his assets.  Moreover, within the five months preceding the Petition Date and while the FINRA Action was pending, Defendant sought the assistance of an asset protection law firm to create an asset protection trust and establish a Limited Liability Limited Partnership (LLLP) to shield his assets from creditors, and while Defendant said that he changed his mind about forming the asset protection trust and tried to instruct the asset protection law firm not to go ahead with the trust formation, such consultation reflects

Defendant's state of mind with an awareness and intent not to pay his nonpreferred creditors.  During this same time period, Defendant then refinanced the loans on the Property and, in the process, took out cash of nearly $250,000.00 from the equity in the Property, and then transferred much of this cash to pay preferred parties, his wife and his home lenders, notably, so he would be able to stay in his residence through advance loan payments.

**ii.      Defendant's Prepetition Transfers to His Friends**

Nonetheless, regarding Defendant's $38,000 of prepetition payments to his friends, the court does not find that such payments by themselves indicate an intent to hinder, delay or defraud his other creditors because the evidence indicates that Defendant was repaying loan obligations to them, which makes these transfers only preferential payments to these creditors, which transfers by themselves do not indicate an intent to hinder, delay or defraud under applicable law.  California Civil Code § 3432; *Hultman v. Tevis, supra.*   According to Defendant, Mr. Springer had advanced Defendant $30,000 in advance capital for a joint business venture that they were going to have, and that he did not have a contractual or written obligation to repay him, and Mr. Jeffers had loaned him $8,000.00 to help him pay personal expenses, and that he did not have a written agreement to repay the loan.  *Trial Testimony of Joseph Ellison*, November 19, 2015 at 10:46-10:48 a.m.   The court determines that Defendant's payment of $30,000.00 to Mr. Springer was to repay money held by Defendant for their joint business venture, but the money belonged to Mr. Jeffers, and not Defendant, as the evidence does not indicate that a gift to Defendant was intended.  The court further determines that Defendant's payment of $8,000.00 to Mr. Jeffers was to repay a loan made by Mr. Jeffers to Defendant.  These transfers, while preferential, do not indicate an intent to hinder, delay or defraud other creditors.

///

1

2

### iii.    Defendant's Prepetition Transfers to His Wife's CNB Account

3    Regarding Defendant's prepetition transfers to his Wife's CNB Account, by

4    transferring a total of $86,000.00 to his wife prepetition, Defendant hindered, delayed and

5    defrauded his creditors' ability to collect on their claims by putting these funds out of his

6    name and into his wife's name and control, which transactions do not exemplify the

7    actions of an "honest but unfortunate debtor." *See Grogan v. Garner*, 498 U.S. at 286-

8    287.  Specifically, six days after the conclusion of a week-long evidentiary hearing in the

9    FINRA Action, Defendant transferred $18,000.00 to his wife's CNB Account.  One week

10    after the FINRA Award issued, Defendant, through two transactions, transferred an

11    additional $51,000.00 to his wife's CNB Account because he was worried about what

12    would happen, he wanted to retain the funds to benefit him and his family, and he did not

13    want anyone to gain access to these funds.  Defendant's wife is an insider for purposes

14    of the Bankruptcy Code pursuant to 11 U.S.C. § 101(31)(A)(i) as a relative of an

15    individual debtor.  *See Hahn v. Leong (In re Llamas),* 2011 WL 7637254, slip op. at *7

16    (Bankr. C.D. Cal. 2011) (dicta in unpublished opinion holding former spouse is not an

17    insider ) ("'Insider,' as defined in § 101(31), specifically includes the spouse of the debtor

18    . . . ."), *citing, Miller v. v. Schuman,* 81 B.R. 583, 585 (9th Cir. BAP 1987) ("A spouse of

19    the debtor is a relative . . . because the definition includes individuals 'related by

20    affinity.'") (dicta as holding related to former spouse).  Defendant's pattern of asset

21    diversions to his wife continued all the way to the Petition Date, when Defendant

22    transferred an additional $17,000.00 to his wife.  Given that within three months of the

23    Petition Date, Defendant transferred at least $86,000.00 from the CNB account in his

24    name to his Wife's CNB Account in which, as previously stated, Defendant had a

25    community property interest, and given that the account belonged to his wife's law

26    practice and that Defendant was not a signatory on the account, the court determines

27    that through such transfers, Defendant intended to hinder, delay and defraud creditors by

28

1  making it difficult for them to collect on their claims because they would have had to

2  establish that his interest in property no longer in his name was still his, having

3  transferred funds in his name to another.  *See In re Woodfield,* 978 F.2d at 518 (intent

4  may be inferred from certain "badges of fraud" that constitute circumstantial evidence of

5  intent, including  a close relationship between the transferor and the transferee);

6  California Civil Code § 3439.04(b)(1) and (2) ("(1) Whether the transfer or obligation was

7  to an insider" and "(2) Whether the debtor retained possession or control of the property

8  transferred after the transfer"); 6 Resnick and Sommer, *Collier on Bankruptcy*, ¶

9  727.02[3][b] at 727-18 and n. 37 ("The fact that a transfer is to a relative or close

10  associate can also be indicative of fraud, as can the debtor's retaining possession,

11  benefits or use of the property that was transferred."), *citing, Pavy v. Chastant (In re*

12  *Chastant)*, 873 F.2d 89 (5th Cir. 1989).

13       Defendant argues that the transfers to his wife of $86,000 in the three months

14  before his bankruptcy case was filed were to "pay customary bills," but there is no

15  evidence to corroborate Defendant's testimony that this was the purpose of the transfers

16  and for the court to determine that such "customary" bills were reasonable living

17  expenses.  *See Defendant's Post-Trial Proposed Findings of Fact and Conclusions of*

18  *Law,* ECF 27 at 6-7, *citing inter alia, Trial Testimony of Joseph Ellison*, November 19,

19  2015 at 9:16 a.m. and 9:51-9:52 a.m.  The court cannot accept at face value Defendant's

20  assertion that his wife used the funds transferred by him to her bank account to pay

21  "customary bills", implicitly suggesting that her use of the transferred funds was

22  reasonable or justifiable, since he admitted in his testimony that her bank account was

23  her own account, that he had nothing to do with it, that he was not a signatory on her

24  bank account, and had no control over the account, thus indicating that he may not have

25  personal knowledge of what she did with the funds transferred to her bank account .  *Trial*

26  *Testimony of Joseph Ellison*, November 19, 2015 at 9:16 a.m. and 9:16-9:18 a.m.;

27  Federal Rule of Evidence 602 (A witness may testify to a matter only if evidence is

28

introduced sufficient to support a finding that the witness has personal knowledge of the matter. . . .").  The only person with personal knowledge of what Defendant's wife did with the funds transferred to her bank account over which she had sole control was the wife, and she did not testify at trial.  It appears that he would only have known what she did with the transferred funds based on what she told him.  Thus, the court determines that Defendant's testimony as to what his wife did with the transferred funds is not credible because he has not provided a foundation for the court to make a finding that he has personal knowledge of that matter, and that the court otherwise has no reliable evidence as to what Defendant's wife did with the funds that Defendant transferred to her account, that is, there is no way of ascertaining from this record whether she used the funds to make preferential transfers to existing creditors, which may indicate a lack of intent to hinder, delay or defraud, or she went on a shopping spree before Defendant filed his bankruptcy case, which may indicate such intent.  Given the timing of the transfers by Defendant to his wife's bank account and the amounts transferred within three months of his filing this bankruptcy case totaling $86,000, of which only $25,793 was listed in her bank account on his bankruptcy schedules, the court infers that the unaccounted for amount of about $61,000 was dissipated for the benefit of Defendant and his wife to avoid paying his nonpreferred creditors, which is similar to the situation in *In re Cooke, supra,* i.e., expenditures for the personal benefit of the debtor rather than payment of current creditors.

According to Defendant, the $18,000 transferred to his wife right before the petition date is accounted for on his bankruptcy schedules as his community property interest in his wife's bank account which is a listed asset on Schedule B-Personal Property (i.e., part of the $25,793 listed on Schedule B for her account).  *Id.* at 7.  This interest is claimed as exempt on Schedule C-Property Claimed as Exempt and is apparently intended to pay for "customary bills" in the future (i.e., postpetition).  Exhibit 8 at 21; *see In re Beverly,* 374 B.R. at 245 ("Even if the exemption is not defeated, the

existence of intent to hinder, delay, or defraud creditors nevertheless may warrant denial

of discharge under § 727(a)(2)."), *citing inter alia, Norwest Bank Neb., N.A. v. Tveten,*

848 F.2d 871, 874-876 (8th Cir. 1988) ("debtor did not want a mere *fresh* start, he wanted

a *head* start") (emphasis in original; internal quotation marks omitted).  Thus, the

circumstances of Defendant's transfers to his wife go beyond the mere fact that

Defendant converted his nonexempt home equity to exempt property to be outside the

holding of *Gill v. Stern, supra.  See also, In re Beverly,* 374 B.R. at 240-241 (discussing

*Gill v. Stern, supra,* in that it involved a transfer from one form of exempt asset to another

form of exempt asset, and was "not a simple instance of eve-of-bankruptcy exemption

planning").

### iv.      Defendant's Other Prepetition Transfers Right Before Filing for Bankruptcy

At or just before the petition date, Defendant also transferred $31,600.00 from

Defendant's non-exempt Joint Account to various destinations.  Aside from the

$17,000.00 transfer to his wife on the Petition Date, which was discussed above

regarding his transfers to his wife, Defendant made two transfers to benefit himself and

his wife by making a contribution of $6,500.00 to a Roth Individual Retirement Account

(IRA) in his name and a contribution of $6,500.00 to a Roth IRA in his wife's name.

Apparently, these were new accounts because Defendant's bankruptcy schedules only

show the amounts of these contributions in the accounts.  *See Defendant's Post-Trial*

*Proposed Findings of Fact and Conclusions of Law,* ECF 27 at 6-7.   Both of these assets

are claimed by Defendant as exempt.  *Id.; see also, In re Beverly,* 374 B.R. at 245 ("Even

if the exemption is not defeated, the existence of intent to hinder, delay, or defraud

creditors may warrant denial of discharge under § 727(a)(2).") (citations omitted).  These

transfers are additional evidence of Defendant's actual intent to hinder or delay his

creditors in light of the other circumstances of his transfers in this case as discussed

herein.

*///*

### v.    The Totality of Circumstances Showing Defendant's
### Actual Intent to Hinder, Delay or Defraud Creditors

The court considers Defendant's admitted animus towards JPMorgan and his fear of former counsel, Shustak, obtaining a judgment and levying Defendant's CNB Account, as further evidence of his actual intent to hinder, delay or defraud creditors through his prepetition asset transfers.  Defendant has been open about his hostility towards both creditors, who and which are the largest unsecured creditors in his bankruptcy case, and the transfer of Defendant's property prevented the distribution of the value of such property to these creditors.  Indeed, if Defendant had not transferred the funds, the funds would be in Defendant's CNB Account and available for distribution as part of the bankruptcy estate.  For instance, had Defendant not made the transfers to Dovenmuehle Mortgage and Logan Investments, $52,477.30 would have been in Defendant's CNB Account on the Petition Date, would have become part of the bankruptcy estate by operation of law, and thus, would have been available for distribution to Defendant's unsecured creditors.  The same is true for all of Defendant's prepetition transfers. Indeed, Defendant recognized that, absent the transfers, the funds would be available to benefit his creditors, including JPMorgan and Shustak.  In order to avoid that outcome however, Defendant admitted at trial that he "had to prioritize where this money went" and the court determines that he made the various transfers at issue to his wife and preferred creditors in the weeks preceding the Petition Date to ensure the funds were distributed, as he, and not the Bankruptcy Code, deemed appropriate.

The court concludes that under these circumstances, as in *Beverly*, Defendant's prepetition transfers were "too much" because they involved a large dilution of non-exempt assets.  *In re Beverly,* 374 B.R. at 245.  On or about March 1, 2014, before Defendant prepaid the loans secured by the First and Second DOTs on the Property, Defendant had at least $247,950.85 in his CNB Account, and considering that Defendant

did not claim an exemption in his CNB account, Defendant would have had non-exempt

assets of at least $247,950.85 that could have been used to pay Defendant's unsecured

creditors.  After the various transfers described above, Defendant had only $600.00 in his

CNB Account on the Petition Date, and almost no assets with which to pay his non-

preferred creditors like Plaintiffs and Shustak.  Furthermore, as detailed above, the

record is replete with evidence that Defendant focused on preventing his non-preferred

creditors from reaching the value in his assets, including the nonexempt equity in the

Property.  Accordingly, based on the dilution of at least $247,350.85 in non-exempt

assets, leaving little to pay the claims of nonpreferred creditors shortly before filing for

bankruptcy, who would be otherwise barred from collecting due to the bankruptcy

discharge, and the dilution of the pool of prepetition assets included Defendant's

transfers of $52,000.00 in non-ordinary course prepayment of his home loans (i.e.,

paying future creditors as opposed to current nonpreferred creditors), and his insider

transfers of $86,000.00 to his wife, and based on evidence of Defendant's prior animus

towards, and intent not to pay, his nonpreferred creditors, such as JPMorgan, including

express admissions, the court determines that Defendant undertook the prepetition

transfers involving large claims of exemption and overtones of overreaching, like the

debtor in *Beverly*, in an effort to become judgment proof as to his non-preferred creditors,

including JPMorgan and Shustak, and thwart their collection efforts against him, and the

evidence surrounding the circumstances of these transfers demonstrate his intent to

hinder, delay, or defraud his creditors to warrant denial of his bankruptcy discharge under

11 U.S.C. § 727(a)(2)(A).

  In making such a determination in this case, the court does not intend to "draw a

line" that demarcates the line between permissible and impermissible prebankruptcy

planning, but rather, the court determines that based on the additional and sufficient

evidence of intent presented in this case beyond the mere fact that Defendant made

some preferential transfers to other creditors immediately preceding his bankruptcy filing,

46

1 | and beyond the mere fact that Defendant converted nonexempt assets to exempt assets,

2 | Defendant "crossed over the line" of what is permissible behavior.  *See In re Beverly,* 374

3 | B.R. at 244-246 (discussing the difficulty in drawing the line between legitimate

4 | bankruptcy planning and intent to hinder, delay or defraud creditors).  Accordingly, the

5 | court determines that under the totality of the circumstances here, the preponderance of

6 | the evidence shows that Defendant transferred property prepetition with the intent to

7 | hinder, delay or defraud creditors, and therefore, the court should deny the entry of a

8 | discharge order in Defendant's bankruptcy case under 11 U.S.C. § 727(a)(2)(A).

9 | **II.    Postpetition Transfers Under 11 U.S.C. § 727(a)(2)(B)**

10 | Through their complaint, Plaintiffs argue that Defendant's discharge should be

11 | denied pursuant to 11 U.S.C. § 727(a)(2)(B).  Nonetheless, the court observes that

12 | Plaintiffs abandoned this claim by failing to introduce evidence supporting the existence

13 | of any postpetition transfers and by failing to argue such at trial.  Accordingly, the court

14 | denies Plaintiffs' claim under 11 U.S.C. § 727(a)(2)(B) for lack of proof.

15 | **III.   Conclusion**

16 | For the foregoing reasons, the court determines that there is adequate and

17 | sufficient evidence to establish by a preponderance that Defendant made prepetition

18 | transfers to preferred parties with actual intent to hinder or delay non-preferred creditors,

19 | including JPMorgan and Shustak, and therefore, Defendant's discharge should be denied

20 | pursuant to 11 U.S.C. § 727(a)(2)(A).

21 | *///*

22 |

23 |

24 |

25 |

26 |

27 |

28 |

1    This memorandum decision constitutes the court's findings of fact and conclusions

2  of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52

3  of the Federal Rules of Civil Procedure.  A separate judgment is being entered

4  concurrently.

5    IT IS SO ORDERED.

6                                        ###

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23  Date: September 23, 2016

24                                        _____
                                          Robert Kwan
25                                        United States Bankruptcy Judge

26

27

28                                        48